**UNITED STATES of America, Appellant,**

v.

**Robert BROOKS, Defendant, Appellee.**

No. 98–1111.

United States Court of Appeals,
First Circuit.

Heard April 9, 1998.

Decided June 5, 1998.

David J. Apfel, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellant.

James B. Krasnoo, with whom Richard Briansky was on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

This interlocutory appeal, brought pursuant to 18 U.S.C. § 3731, challenges a brink-of-trial order precluding the government from introducing into evidence certain proof that it deems essential to the prosecution of the crimes charged. A subsequent clash of wills between the prosecutor and the district judge complicates the picture on appeal. We rehearse the background and the travel of the case, untangle a jurisdictional snarl, and then address the merits of the dispute. In the end, we vacate the preclusory order and remand for further proceedings before a different district judge.

## I. BACKGROUND

In the underlying criminal case, the government charged defendant-appellee Robert Brooks with lying to a federal grand jury. To lend context to the issues before us, we recount the circumstances leading up to the defendant's indictment on perjury and obstruction of justice charges.

### A. *Dramatis Personae.*

Starting in 1983, Brooks worked as a baggage handler for Northwest Airlines at Logan International Airport. While there, he became friendly with a co-worker, Joseph Nuzzo.[1] Some four years later, Northwest broke the gender barrier and hired Susan Taraskiewicz as a baggage handler. With a few notable exceptions, Brooks and Taraskiewicz had little interaction. Early on, however, the pair twice indulged a sexual dalliance, and, on one subsequent occasion, they argued bitterly over Brooks's destruction of Taraskiewicz's radio.

In April of 1989, Taraskiewicz attempted to break up a fistfight between Nuzzo and two other employees. Displeased by her gratuitous intervention, Nuzzo called Taraskiewicz a "f____g c__t." This incident capped a string of disciplinary infractions and led Northwest to fire Nuzzo. Nuzzo's discharge was not permanent—it turned out to be the functional equivalent of a six month suspension without pay—but Nuzzo vociferously blamed Taraskiewicz for his predicament. During his absence from work, he engaged in a campaign of menacing conduct directed at Taraskiewicz: he "keyed" her car, slashed her tires, staked out her house, made anonymous telephone calls, and told others that he would exact revenge. Brooks knew that Nuzzo blamed Taraskiewicz for his enforced vacation and that Nuzzo harbored considerable ill will toward her.

---

1. Brooks minimizes the closeness of this relationship, but he does not dispute that he was the best man at Nuzzo's 1991 nuptials and that Nuzzo served as an usher at his wedding the following year.

## B. *Theft and Murder.*

Shortly after Nuzzo returned to work, he and several other baggage handlers began to steal credit cards from mail bags air-freighted by Northwest. The thieves purloined thousands of charge cards, using some of them to make unauthorized purchases and selling others to fences. Brooks was a peripheral player; he did not himself steal any charge cards but he occasionally shopped with Nuzzo, using stolen cards, and he sometimes functioned as a paid lookout for Nuzzo and the other thieves.

In 1991, an inter-agency task force launched an investigation into the credit card scheme. The investigation remained in the bosom of the lodge until August 4, 1992, when several baggage handlers received subpoenas from a Boston-based federal grand jury (the Credit Card Grand Jury). Members of the ring, including Nuzzo, wondered whether there was a stool pigeon among the baggage handlers. In Brooks's presence, Nuzzo posited that Taraskiewicz was the "rat."

On August 14, a Northwest official confiscated Nuzzo's work identification, effectively ending his employment. In rapid sequence, Nuzzo learned that he was a target of the grand jury investigation, hired a lawyer, and griped to friends (following a meeting between his attorney and a prosecutor) about both the severity of the criminal sanctions that he faced and the extravagance of his lawyer's fee demands. In the early morning hours of September 13, 1992—less than a week after Nuzzo voiced these complaints—Taraskiewicz left work to get a sandwich and failed to return. The next day, the authorities discovered her body in the trunk of her automobile.

## C. *To Tell the Truth.*

Brooks applied for reassignment immediately after news of the grand jury investigation leaked. He received the requested transfer and moved to Minnesota with his new bride on August 25, 1992. Following Taraskiewicz's murder, however, the government subpoenaed him to appear before the Credit Card Grand Jury. Brooks returned to Massachusetts in response to this subpoena but asserted his Fifth Amendment privilege. That same afternoon, a state trooper interrogated him regarding the murder. In the course of a one-hour interview, Brooks downplayed his relationship with Nuzzo and claimed that he had had only one telephone conversation with his friend during the week after the murder. In accounting for his own whereabouts on the night of September 13, Brooks said that he had worked the late shift at the Minneapolis–St. Paul airport, handling luggage until 11:00 p.m.

During the 1994–1995 time frame, Brooks cooperated in the credit card investigation. His testimony apparently helped to convict Nuzzo of various charges connected to the credit card scheme. Eventually, Brooks pled guilty to conspiracy to commit mail theft and credit card fraud. The government requested that the court recognize Brooks's substantial assistance and depart downward in imposing sentence. *See* USSG § 5K1.1. Brooks escaped with a term of probation.

In the fall of 1996, storm clouds gathered anew. The United States Attorney convened a second Boston-based grand jury (the Murder Grand Jury) to look into Taraskiewicz's death. The Murder Grand Jury subpoenaed Brooks in October and he again returned to Boston. During a two-day meeting with law enforcement agents, Brooks learned that Nuzzo was a target of the probe and that the Murder Grand Jury was seeking to determine whether someone assassinated Taraskiewicz to ensure her silence anent the credit card case.

Pursuant to a limited immunity agreement, Brooks testified twice before the Murder Grand Jury. He admitted, *inter alia*, that Nuzzo blamed Taraskiewicz for his six-month suspension and that Nuzzo more than once expressed his staunch belief that Taraskiewicz was a "snitch" who "blew the whistle" on the credit card scheme. Brooks reiterated that he was working on the night of Taraskiewicz's slaying and that he had not spoken to Nuzzo at all that weekend. Although given the chance to recant or change his testimony while still under oath, Brooks demurred.

### D. *The Charges.*

In June 1997, the government confronted Brooks with documentary evidence showing that he was not at work on the night of the murder, that he talked to Nuzzo that weekend, and that the two spoke frequently during the ensuing month. Facing time cards and long-distance telephone records that contradicted both his testimony to the Murder Grand Jury and his 1992 statements, Brooks admitted that he had lied about his whereabouts and contacts with Nuzzo. He expostulated, however, that his testimony was neither intentionally false nor designed to impede the homicide investigation. Unimpressed by this disclaimer, the Murder Grand Jury charged Brooks with three counts of perjury, *see* 18 U.S.C. § 1623, and two counts of obstruction of justice, *see* 18 U.S.C. § 1503.

## II. PROCEEDINGS BELOW

Following some pretrial skirmishing, not material here, the district court scheduled Brooks's trial to commence on February 9, 1998. One week prior to this trial date, Brooks filed five motions in limine whereby he sought to prohibit the government from introducing sundry types of proof, including evidence as to the details of the murder, evidence of Brooks's conviction in the credit card case, and evidence concerning the sexual encounters between Brooks and Taraskiewicz. The government opposed these motions. Its memorandum in opposition revealed that it

> intend[ed] to introduce evidence showing, inter alia, that: (a) Nuzzo was discharged from Northwest for six months in 1989–90 for, among other things, calling Taraskiewicz a "f___kin_ c__t"; (b) Nuzzo blamed Taraskiewicz for his discharge; (c) following his discharge, Nuzzo swore to get even with Taraskiewicz, and promised to make her life miserable; (d) Nuzzo sliced Taraskiewicz's car tires, and "keyed" her car; (e) he made prank phone calls to her house; (f) he drove by her house with a friend, and noted that her street was dark, that she was going to pay, and that he was going to get even with her; and (g) in August 1992, just one month before Taraskiewicz's murder, and just after Nuzzo, Brooks, and other credit card thieves had learned that [federal agents] were on to them, Nuzzo stated that he bet Taraskiewicz was the "snitch" or the "rat."

Government's Opposition at 5 n. 3. On February 6, Judge Harrington issued an order granting Brooks's quintet of motions in substantial part, including the motion to exclude proof anent his relationship with the deceased. The court specified that it was barring evidence of this relationship only from the government's case in chief and left open the possibility that such evidence might become relevant should Brooks opt to testify in his own defense.

At approximately 9:00 a.m. on the morning of the first trial day, immediately prior to jury empanelment, the defense filed a sixth motion in limine. This motion sought the exclusion of all evidence regarding Nuzzo's animosity toward Taraskiewicz. Judge Harrington had not yet taken the bench but within fifteen minutes the clerk announced that the judge had granted the motion. The ruling took the form of an inexplicit margin order, and the prosecutor asked the clerk to advise the judge that he wished to be heard. The judge refused the request.

At 9:30 a.m., the venire filed into the courtroom and Judge Harrington assumed the bench. The prosecutor, David Apfel, asked to approach the sidebar. The judge responded: "After the jury is selected." The prosecutor persisted and the judge summoned counsel to the bench. Without giving either lawyer an opportunity to speak, Judge Harrington stated:

> Mr. Apfel, if you open your mouth once more, you'll be excluded from this case. With respect to the matter that I've heard you discuss previously with the clerk.[sic] I'm picking the jury now. You're either going to go back there or I'm excluding you from this case.

A colloquy then ensued:

> PROSECUTOR APFEL: I think you should exclude me, then, Your Honor, because I hereby notice of [sic] an appeal from your ruling allowing Motion in Limine No. 6.

THE COURT: Motion denied.

PROSECUTOR APFEL: It's not a motion, your Honor. You no longer have jurisdiction over the matter once we notice an appeal to your ruling. An appropriate certification is being prepared right now under [18 U.S.C. § ] 3731. The government simply can't go forward with this ruling. There is no evidence that we will be able to present as to a crucial element of each of the perjury counts and as to a crucial element of each of the obstruction counts.

THE COURT: I'm picking a jury now, do you understand me?

PROSECUTOR APFEL: I do. Your Honor, you no longer have jurisdiction, and I think that you should exclude me from the court.

The bench conference concluded on this somber note and the judge began jury empanelment. Within a very short span (ten transcript pages), Timothy Feeley, Apfel's supervisor, entered the courtroom. The following discourse took place:

PROSECUTOR FEELEY: Your Honor, if I may, Timothy Feeley for the United States. The government requests permission to approach the side bar if we may, your Honor.

THE COURT: Not at this time.

PROSECUTOR FEELEY: Your Honor, in the alternative, the government would wish to file with the Court at this time a notice of appeal.

THE COURT: Give it to the clerk, please.

\* \* \* \* \* \*

PROSECUTOR FEELEY: Your Honor, given the filing of that document, may we now approach side bar?

THE COURT: Denied.

PROSECUTOR FEELEY: Your Honor, the government states for the record that this Court lacks jurisdiction.

COURT: Here is the—Please come.

[At the bench]

THE COURT: If you speak before that jury again, I'm going to declare a mistrial.

PROSECUTOR FEELEY: Your Honor, may I be heard? The filing of a notice of

appeal divests this Court of jurisdiction. This matter is now before the United States Court of Appeals for the First Circuit, and further proceedings by this District Court are without power.

THE COURT: Let me tell you this, you have no right to appeal an interlocutory ruling, I would say, bordering on the obstruction of justice. [sic]. Now if you don't sit down, I'll call the marshals and have you arrested.

PROSECUTOR FEELEY: Your Honor, I refer this Court to United States Code, Title 18, Section 3731, that gives us the right to appeal a motion of this sort given the certification that we provided to the Court from the United States Attorney for this district.

\* \* \* \* \* \*

THE COURT: What I'm going to do, I'm proceeding with or without you at this time. If there is a stay issued by the Court of Appeals, I will obey their order.

PROSECUTOR APFEL: Your Honor—

THE COURT: Let us proceed.

PROSECUTOR APFEL: May [we] be heard briefly on this?

PROSECUTOR FEELEY: I would like to be heard, Your Honor. The government will not participate further in these proceedings. We will spend our time for the next whatever time is necessary to obtain a stay.

THE COURT: Then do so.

PROSECUTOR FEELEY: Which, for the record, we do not feel is necessary, given the filing of a notice of appeal, that divests the Court of jurisdiction with or without a stay. If necessary, we will seek a stay.

THE COURT: I am ordering you to seek a stay.

PROSECUTOR FEELEY: Then we initially ask this Court to stay its proceedings to give us time to do that.

THE COURT: Denied.

PROSECUTOR FEELEY: Your Honor, we further ask this Court for a continuance of this matter—

THE COURT: Motion denied.

Subsequent to this exchange, both prosecutors left the courtroom. Judge Harrington nonetheless persevered and continued empaneling a jury in their absence.

Approximately fifteen minutes later, with empanelment still in progress, Apfel reentered the courtroom and again requested a brief recess to facilitate the filing of a stay motion in the court of appeals. Judge Harrington turned a deaf ear and ordered twelve potential jurors to take seats in the jury box. Apfel remained in the courtroom and the parties proceeded to exercise their peremptory strikes. During a bench conference related to challenges, the protagonists received word that the stay motion had been filed and that the court of appeals had taken it under advisement. Apfel again solicited a short recess, and the court again rejected his entreaty.

When the parties' strikes were exhausted and fourteen prospective jurors (including two alternates) were seated, Judge Harrington directed the clerk to swear the jury. The following exchange then took place at the bench:

PROSECUTOR APFEL: Your Honor, may I be heard, before the jury is sworn in?

THE COURT: Swear in the jury. I'm not going to put up with it any longer.

PROSECUTOR APFEL: Your Honor, you haven't given us an opportunity, we're moving once again to stay these proceedings.

THE COURT: Motion denied, motion denied, motion denied.

PROSECUTOR APFEL: If you give us an opportunity to—

THE COURT: Motion denied.

The clerk thereupon swore the jurors and Judge Harrington gave them a decurtate explanation of their functions. He then ordered the government to make its opening statement. At that juncture, the following transpired:

PROSECUTOR APFEL: Your Honor, may we approach side bar?

THE COURT: No. Please make the opening statement.

PROSECUTOR APFEL: In light of the Court's rulings this morning, Your Honor—

THE COURT: Then I'll see you. I don't want you to make a statement before the jury.

[At the bench]

PROSECUTOR APFEL: In light of the Court's ruling this morning, the government's case is almost entirely eviscerated. Your Honor has, by virtue of his rulings, made it impossible, I would say, for the government to prove the crucial element of materiality with respect to the perjury counts and the crucial element of intent with respect to the obstruction counts. You have by virtue of your ruling eliminated, I would say, 90 percent of what I intended to say in my opening. A motion is now pending with the First Circuit Court of Appeals which we expect to rule momentarily. It's my view that if the Court insists on going forward right now, if the government is forced to make an opening statement, in light of the Court's rulings, that the government would be irretrievably prejudiced in its opening statement in the case.

THE COURT: Are you going to make your opening statement?

PROSECUTOR APFEL: I am asking the Court for a recess for ten minutes.

THE COURT: Motion denied.

PROSECUTOR APFEL: The government is then, Your Honor, going to leave this room right now because the Court does not have jurisdiction over this matter, and we need a few moments. I'm asking for a brief stay so that we can see what the Court of Appeals is doing.

THE COURT: I'm asking you at this time—I'm not letting you interfere with the regularity of the proceedings in the United States District Court. If the Court of Appeals takes any action, they shall do so and you will be alerted. At this time I am asking you, are you prepared to go forward? And I'm telling you this, if you do not, I will entertain a Motion to Dis-

miss. Are you prepared to go forward at this time?

 * * * * * *

Are you prepared to follow the [Court's] order?

We need not repeat verbatim the remaining dialogue. It suffices to say that the judge pressed relentlessly for an answer to this question and threatened to dismiss the case with prejudice if the prosecutor declined to open. After one last fruitless attempt to persuade the judge to hold proceedings in abeyance pending word from the court of appeals, the prosecutor yielded and began his opening remarks. As he was speaking, a second prosecutor entered the courtroom and tendered a stay order issued by the court of appeals. The district judge then halted the proceedings and excused the jury temporarily. After we issued a further stay and set an expedited briefing schedule, the judge excused the jury *sine die.*

## III. APPELLATE JURISDICTION

The threshold question presented for our appraisal involves Brooks's claim that we lack jurisdiction to hear and determine this interlocutory appeal. Answering this question requires us to construe 18 U.S.C. § 3731, the statute that regulates the form and timing of government appeals from certain pretrial evidentiary rulings in criminal cases.[2] Section 3731 confers a right to an immediate appeal if the district court, in a pretrial ruling, bars the government's use of particular evidence, and the United States Attorney files a timely notice of appeal accompanied by the requisite certification. *See United States v. Barletta,* 644 F.2d 50, 53 n. 1 (1st Cir.1981).

■ Despite Brooks's importuning, we conclude, without serious question, that these criteria were satisfied in the instant case. The challenged pretrial order extirpated evidence that the government considered to be "substantial proof" of specified elements of the charged offenses, and the United States Attorney so certified. The link forged in the certificate between the excluded evidence and the crimes charged is not implausible. *See, e.g., United States v. Scivola,* 766 F.2d 37, 44 (1st Cir.1985) (discussing crime of perjury); *United States v. Cintolo,* 818 F.2d 980, 990–93 (1st Cir.1987) (discussing crime of obstruction of justice). Moreover, both the challenged ruling and the government's appeal from it, appending the required certificate, occurred before jeopardy attached. *See, e.g., United States v. Brand,* 80 F.3d 560, 568 (1st Cir.1996) (explaining that jeopardy typically attaches when a trial jury is sworn), *cert. denied,* —— U.S. ——, 117 S.Ct. 737, 136 L.Ed.2d 676 (1997). No more is exigible under section 3731.[3] *See United States v. McKoy,* 78 F.3d 446, 449 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996).

■ In reaching this conclusion, we reject out of hand Brooks's assertion that a ruling on a motion in limine is a stopgap order of the trial court and, as such, should be distinguished from a suppression order for purposes of section 3731. In drawing the distinction between appealable and non-appealable pretrial orders, labels are unhelpful. Sometimes a district court, faced with a pretrial motion in limine, will temporize, *see, e.g., United States v. Holmquist,* 36 F.3d 154, 163–64 (1st Cir.1994), and the resultant order, depending on the degree of finality associated with it, may or may not

---

**2.** The statute provides in pertinent part:
> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence ..., not made after the defendant has been put in jeopardy ..., if the United States Attorney certifies to the district court that the appeal is not taken for the purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.
18 U.S.C. § 3731 (1994).

**3.** We need not decide the more vexing question of whether section 3731 actually requires the government to file its notice of appeal prior to the attachment of jeopardy. *Compare United States v. Shears,* 762 F.2d 397, 400 (4th Cir.1985) (suggesting, in dictum, that such an appeal may be taken even after jeopardy attaches), *with United States v. Layton,* 720 F.2d 548, 554 (9th Cir. 1983) (suggesting the contrary). At any rate, the statute plainly envisions that the government will move quickly in announcing its intent to appeal a pretrial evidentiary order and, in this case, the government did just that.

qualify as an order excluding evidence under section 3731. But such theoretical possibilities have no bearing here, for Judge Harrington's ruling constitutes an unqualified preclusion. An order that grants a motion in limine with such a degree of finality falls squarely within the statutory sweep. *See United States v. LeCompte*, 131 F.3d 767, 768 (8th Cir.1997); *United States v. Lachman*, 48 F.3d 586, 590 (1st Cir.1995); *United States v. King*, 827 F.2d 864, 866–67 (1st Cir.1987); *see also* S.Rep. No. 91–1296, at 18 (1970) (stating that Congress intended section 3731 "to be liberally construed so as to effectuate its purpose of permitting the Government to appeal ... from all suppression and exclusions of evidence in criminal proceedings, except those ordered during trial"). In other words, pretrial orders that have the practical effect of excluding material evidence at trial are appealable under section 3731, regardless of nomenclature, and Judge Harrington's preclusory order is of this genre.

■ Brooks's second jurisdictional argument is no more persuasive. Citing a line of cases that hold that the government may not appeal under section 3731 if its appeal will interrupt an ongoing trial, *see, e.g., United States v. Kington*, 801 F.2d 733, 735 (5th Cir.1986); *United States v. Harshaw*, 705 F.2d 317, 319 (8th Cir.1983), Brooks brands the government's appeal as untimely because the district court swore the jury and started the trial before the court of appeals stayed all proceedings. Here, however, the prosecution noticed the appeal before the trial started, and it is the filing of the notice of appeal, rather than the issuance of a stay, that marks the point at which an appeal is taken.

*See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). Because the government lodged the appeal, in proper form, prior to jury empanelment, the appeal is timely and falls within the appellate jurisdiction conferred by 18 U.S.C. § 3731. *See United States v. Mavrokordatos*, 933 F.2d 843, 846 (10th Cir.1991). The fact that the appeal pretermitted a subsequently commenced trial that was ongoing solely because the judge inexplicably insisted on commencing the trial after he had notice of the government's appeal is not sufficient to defeat the government's statutory right of appeal. The trial never should have begun (and was, therefore, a nullity).[4]

## IV. THE EVIDENTIARY RULING

■ Having concluded that the instant appeal is properly before us, we briefly address its substance. We review the district court's evidentiary decision, made pursuant to Fed.R.Evid. 403, for abuse of discretion. *See United States v. Rodriguez–Estrada*, 877 F.2d 153, 156 (1st Cir.1989). This is ordinarily a forgiving standard, but the present circumstances are far from ordinary: the evidentiary question is highly nuanced; the correct answer is not self-evident; the lower court ruled without giving the government an opportunity to file an opposition; the court refused—for no readily apparent reason—to permit the government to be heard; and the court made no specific findings.[5] This con-

---

4. We need not decide whether an appeal would lie if the district judge managed to empanel and swear the jury before the government was able to submit its notice of appeal. *See* 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3919.3, at 147 n. 51.5 (Supp.1998) (suggesting that double jeopardy principles might yield in such an extreme situation).

5. Judge Harrington granted Brooks's sixth motion in limine on February 9, by means of a margin order bereft of exposition. On February 10, after the government had appealed and this court had stayed the district court proceedings,

the judge issued a one-paragraph memorandum explaining his evidentiary determination (a determination that, in the judge's view, had been "erroneously reported in the press"). The memorandum stated in conclusory fashion that the excluded evidence was "not directly relevant to the perjury and obstruction charges against Defendant Brooks, and, if introduced, such evidence would be highly prejudicial to the defendant." We have taken this memorandum into account. *See, e.g., Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 895 (1st Cir.1988). This court heard oral arguments on April 9, 1998—arguments which were well-publicized in the local media. On April 13, Judge Harrington filed an unsolic-

catenation of circumstances calls the district court's hair-trigger evidentiary determination into serious question—so much so as to warrant a conclusion that the district court abused its discretion. *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 836 (3d Cir. 1990) (finding abuse of discretion when the trial court failed to give plaintiffs a chance to present their arguments, ruled on an insufficient factual record, and did not provide a reasoned explanation for its evidentiary ruling); *see also United States v. Roberts*, 978 F.2d 17, 24–25 (1st Cir.1992) (indicating that trial court's conduct in making a judicial determination can constitute, or contribute to, an abuse of discretion).

We do not reach this conclusion merely because the judge ruled on the spot. Speed is often a virtue, and many pretrial rulings can be made instantaneously, or nearly so. Still, not all situations are straightforward. In this instance, Brooks's motion was far from a clear-cut winner, and the celerity with which the district court acted precluded reasoned consideration (after all, the judge never listened to the government's side of the story) and the development of a satisfactory record.

Nothing illustrates this reality more poignantly than the voluminous factual proffers that the litigants have made in this court (the government by elaborate extra-record footnotes to its briefs and Brooks by a motion to supplement the record). The proper functions of an appellate court and a trial court differ significantly—and appellate courts have a well-founded institutional reluctance to step outside their wonted role to weigh facts and arguments that were never presented to the trial court. *See, e.g., United States v. Vaknin*, 112 F.3d 579, 591 (1st Cir.1997); *Perkins v. LeFevre*, 642 F.2d 37, 41 (2d Cir.1981). Here, moreover, the record's sparseness is not the only red flag. The arbitrary manner in which the judge proceeded furnishes a complementary reason, powerful in itself, for securing a more measured exploration of the evidentiary question.

For these reasons, we believe that we have no principled choice but to vacate the challenged ruling and remand for a full and orderly consideration of this seemingly critical evidentiary point. In charting this course, we intimate no view of the proper disposition of the sixth in limine motion, as that is for the district court in the first instance.

## V. PROCEEDINGS ON REMAND

Our journey is not yet at an end, for the parties dispute the proper post-remand posture of the case. Brooks says, in effect, that although the filing of the appeal may have divested the trial court of authority in respect to the contested evidentiary ruling, the court nonetheless retained the power to continue with jury selection and empanelment (including administration of the oath to the jurors). Thus, in Brooks's view, jeopardy has attached and the trial that is already in progress must proceed before the previously selected jury. The government strenuously disagrees. It posits that the filing of the appeal divested the district court of any and all authority over the case, and that, therefore, Judge Harrington's subsequent actions (including swearing the jury) are null and void. The government also wishes us to direct that the case proceed before a fresh judge. Brooks calls this "judge-shopping," lauds Judge Harrington, and suggests that fulfilling the government's wish would be a grave mistake.

### A. *Retained Authority.*

■ To resolve the first of these conflicts, we must map the contours of the authority (if any) that a district court retains once the government properly notices an interlocutory appeal under 18 U.S.C. § 3731, and then apply that revealed knowledge to the case at bar. We begin with accepted doctrine: as a general rule, the filing of a notice of appeal "divests a district court of authority to proceed with respect to any matter touching upon, or involved in, the appeal." *United States v. Mala*, 7 F.3d 1058, 1061 (1st Cir. 1993). Though judicially spawned, not legis-

ited two-page statement of his reasons for excluding the evidence. Given the timing and the attendant circumstances, we do not give any substantial weight to this statement.

latively ordained, this rule has sturdy roots. *See, e.g., Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 379, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *United States v. Distasio,* 820 F.2d 20, 23 (1st Cir. 1987); *see also* 20 James Wm. Moore et al., *Moore's Federal Practice* § 303.32[1] (3d ed.1998). It derives from the notion that shared jurisdiction almost always portends a potential for conflict and confusion, *see United States v. Ienco,* 126 F.3d 1016, 1018 (7th Cir.1997), and although there has been some movement in the direction of a more flexible approach, *see* 9A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3949.1, at 45 n. 23 (2d ed.1996), the principle that jurisdiction over a single case ordinarily should reside in a single court at any single point in time still has widespread applicability, *see Griggs,* 459 U.S. at 58, 103 S.Ct. 400; *Apostol v. Gallion,* 870 F.2d 1335, 1337 (7th Cir.1989). Allowing more than one court to take charge of a case at any given moment often disserves the interests of comity and judicial economy. *See Shewchun v. United States,* 797 F.2d 941, 943 (11th Cir.1986).

Like most rules, the rule that either the trial or the appellate court—but not both—may have jurisdiction over a case at any given point in time admits of some exceptions. Thus, a district court can proceed, notwithstanding the filing of an appeal, if the notice of appeal is defective in some substantial and easily discernible way (if, for example, it is based on an unappealable order) or if it otherwise constitutes a transparently frivolous attempt to impede the progress of the case. *See Kusay v. United States,* 62 F.3d 192, 194 (7th Cir.1995); *Mala,* 7 F.3d at 1061.

 Brooks labors to bring himself within the confines of this exception. First, he asserts that the government's appeal is frivolous (or, at least, that Judge Harrington treated it as frivolous and therefore was entitled to proceed). We are not persuaded. The district court's preclusory order is plain-

ly appealable and the record contains nothing that would justify a finding of frivolousness.[6] Furthermore, Brooks has not attacked the certification that accompanied the appeal and that certification appears regular on its face. Finally, the circumstances belie any suggestion that the prosecution harbored dilatory motives.

 Ably represented, Brooks introduces another, potentially more nettlesome notion—the principle of shared jurisdiction. The black-letter rule that the filing of a notice of appeal transfers authority over the case from the trial court to the court of appeals derives from a desire to prevent clashes between institutions that occupy different tiers within the federal judicial system. Thus, the trial court may continue to exercise a modicum of power over a case that is before the appellate court—but this power exists only in those few situations in which the risk of an intramural collision is small. *See Ienco,* 126 F.3d at 1018; *Kusay,* 62 F.3d at 194. Brooks asseverates that the district court's actions in this case come within the narrow ambit of this shared jurisdiction.

By its nature, any suggestion of shared jurisdiction is sensitive and, thus, the administration of this principle requires a delicate touch. At most, shared jurisdiction flourishes in a circumscribed cluster of situations, the handling of which is not inconsistent with the prosecution of an appeal. *See United States v. Hurley,* 63 F.3d 1, 23 (1st Cir.1995). These situations include the processing of such peripheral or ancillary aspects of the case as motions for counsel fees, *see In re Nineteen Appeals,* 982 F.2d 603, 609 n. 10 (1st Cir.1992); actions "in aid of execution of a judgment that has been appealed and not stayed," *Hurley,* 63 F.3d at 23; and orders relating to procedures "in aid of the appeal," *Spound v. Mohasco Indus., Inc.,* 534 F.2d 404, 411 (1st Cir.1976) (internal quotation marks omitted).

Of course, these examples have limited relevance in terms of section 3731. Appeals under that statute are by definition predicat-

---

6. We note in passing that the trial judge did not make such a finding. Even if he had, it would not be conclusive. In this context, frivolousness is a question of law and thus subject to de novo review. *See In re Howard,* 996 F.2d 1320, 1327 (1st Cir.1993) (stating that questions of law engender de novo review).

ed on specific evidentiary rulings and thus the taking of a section 3731 appeal may not necessitate a wholesale surrender of the trial court's jurisdiction. *See Ienco,* 126 F.3d at 1018. In the end, each section 3731 case is *sui generis* as it relates to the possibility of shared jurisdiction. The specific question that must be answered today is whether a district court, after it receives notice of a properly filed section 3731 appeal, nonetheless may swear a jury and start the trial.[7] We think not.

The swearing of a jury is a matter of enormous consequence to both the prosecution and the defense in a criminal case. Moreover, jury empanelment initiates the trial, and jeopardy attaches when the jury is sworn. *See Brand,* 80 F.3d at 568; *United States v. Pierce,* 60 F.3d 886, 889 (1st Cir. 1995). This activity goes well beyond mere preparation for trial, and engaging in it while an appeal from a preclusory order is pending undermines the primary goal of section 3731. After all, Congress crafted section 3731 specifically to permit the resolution of evidentiary appeals *before* the commencement of trial. *See Harshaw,* 705 F.2d at 319 (discussing history of 18 U.S.C. § 3731). Whatever residual authority remains with a district judge to continue preparations for trial once the government launches a section 3731 appeal, the court retains no power to swear a jury and begin the trial during the pendency of such an appeal. *Accord Mavrokordatos,* 933 F.2d at 846.

*United States v. Gatto,* 763 F.2d 1040 (9th Cir.1985), much relied upon by Brooks, does not require a contrary result. In *Gatto* the district court excluded evidence a few days before trial *as a sanction,* holding that the prosecution's tardy document production transgressed the court's discovery order. *See id.* at 1043–44. The government appealed pursuant to section 3731. After the district judge declined to stay or adjourn the trial, the government refused to go forward and the judge dismissed the indictment for failure to prosecute. *See id.* at 1044.

Brooks touts *Gatto* not for its holding—the Ninth Circuit reversed, finding an abuse of discretion, *see id.* at 1051—but for its dictum. The *Gatto* court at one point observed that "a district court retains the naked power, in appropriate cases, to dismiss an indictment while a section 3731 appeal from a pretrial order is pending." *Id.* at 1049 (citation and internal quotation marks omitted). From this dictum, Brooks reasons that if a nisi prius court retains the authority to dismiss a case entirely after a section 3731 appeal has been perfected, then, surely, the court retains the power to begin the trial by selecting a jury. Brooks's view is much too sanguine.

There are substantial differences between the dismissal of an indictment as a sanction, before jeopardy attaches, and bringing jeopardy into play by swearing a jury and thus initiating the trial proper. In the former circumstance, the court's ruling is at least arguably collateral and does not clash directly with the fundamental objectives of section 3731. In the latter circumstance, however, the trial court's action serves to frustrate the core purpose of section 3731, forcing the government to try the case without a substantial piece of evidence. *See United States v. Kelly,* 683 F.Supp. 251, 254 n. 5 (S.D.Fla. 1988). Given these salient distinctions, *Gatto* simply cannot be read as authority for the district court's swearing of a jury while a section 3731 appeal pends.

To summarize, we hold that the filing of a proper notice of appeal pursuant to section 3731 divests the district court of its authority to swear a jury and start the trial. *See Mavrokordatos,* 933 F.2d at 846; *see also Kusay,* 62 F.3d at 194 (explaining that, during the pendency of a section 3731 appeal, the district court lacks jurisdiction to perform any activity that "cannot be described as an ancillary or unrelated matter"). No separate stay is necessary. This means, of course, that the actions taken by Judge Harrington subsequent to the docketing of the government's appeal were nullities. On remand, the slate must be wiped clean, the

---

**7.** We express no opinion on whether a district court might continue processing jurors while awaiting word from the court of appeals. Whatever may be said of that practice, the district court in this case took the further, more serious steps of completing the jury selection process, administering the oath, and beginning the trial. We focus, therefore, on those activities.

jurors discharged, and a new jury selected and sworn.

## B. The Request for Removal.

■ The government, over Brooks's vigorous opposition, entreats us to oust Judge Harrington from the case and remand to a different trier. It maintains that the judge has dug in his heels and that the heavy-handed manner in which he brushed aside the government's attempt to exercise its rights under section 3731 renders his continued participation in the case problematic. These are serious accusations, and we treat them as such.

■ In resolving this contretemps, we evaluate the judge's actions "according to a standard of fairness and impartiality, recognizing that each case tends to be fact-specific." *United States v. Polito*, 856 F.2d 414, 418 (1st Cir.1988) (citations and internal quotation marks omitted). We apply this standard mindful that judges must not only be scrupulously fair in the administration of justice, but also must foster an aura of fairness. *See Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954) (admonishing that "justice must satisfy the appearance of justice"); *see generally United States v. Balistrieri*, 779 F.2d 1191, 1204 (7th Cir.1985) (examining the legislative history of 28 U.S.C. § 455(a)—the recusal statute—and stating that this statute "is directed against the *appearance* of partiality, whether or not the judge is actually biased") (emphasis in original).

Approaching the record from this standpoint, we take a practical, commonsense view of what transpired below. In the process, we grant the judge a "margin of humanity." *Polito*, 856 F.2d at 418. Presiding over a hotly contested trial is not a pastime for the faint of heart, and a trial judge, under fire, cannot be expected to function either as a saint or as a bloodless automaton. *See id.* Despite these allowances, however, we are persuaded that the judge's conduct in this case went well beyond the pale.

We see nothing to be gained from exegetic treatment of this point. We have set out at considerable length the relevant portions of the transcript chronicling the events sur-

rounding this appeal *See supra* Part II. Taken alone, the judge's adamant refusal to hear the government and his intransigence in pushing forward with the case despite the loss of jurisdiction would give us pause. Those events are all the more unsettling here because of the judge's intemperate treatment of counsel. The government, as well as the defendant, deserves a fair trial, and, given the historical record, continuing the case before the same jurist would run an unacceptably high risk of shrouding the trial in an aura of partiality. Consequently, we grant the government's request, remove Judge Harrington from further participation in the case, and direct that the case be assigned, on remand, to a different district judge.

## VI. CONCLUSION

We need go no further. For the reasons stated herein, we vacate the order granting Brooks's sixth motion in limine and remand the case to the district court for further proceedings before a new trier (who, among other things, shall discharge the previously empaneled jury). We add, moreover, that the newly designated district judge shall be free, on remand, if he or she chooses to do so, to revisit any earlier ruling in the case (including but not limited to the disposition of the first five in limine motions). *See Flibotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 25 (1st Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1806, 140 L.Ed.2d 945 (1998).

*So Ordered.*