**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 15 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

JOSE DE JESUS VALADEZ-
CAMARENA,

Defendant-Appellant.

No. 98-2154

(D.C. No. CR-97-231-JP)
(District of New Mexico)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **HENRY**, and **BRISCOE**, Circuit Judges,

Jose de Jesus Valadez-Camarena was convicted after a jury trial of conspiring to distribute cocaine (in violation of 21 U.S.C. §§ 841 (a)(1) and 846 and 18 U.S.C. § 2) and of possessing cocaine with the intent to distribute it (in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)). The district court sentenced him to concurrent terms of imprisonment of 240 months, followed by five years of supervised release.

Mr. Valadez now argues that, in light of his filing of a notice of appeal of a

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

previous ruling (denying his motion to dismiss the indictment on double jeopardy grounds), the district court lacked jurisdiction to proceed with the trial. In the alternative, Mr. Valadez argues that the evidence is insufficient to support his conviction on either the possession or the conspiracy charge. For the reasons set forth below, we conclude that because it properly found that Mr. Valadez's motion to dismiss the indictment was frivolous, the district court had jurisdiction to proceed with the trial. On the merits, we conclude that the evidence is sufficient to support the convictions on both the possession and the conspiracy counts.

## I. BACKGROUND

### A. The indictment, the first trial, and the motion to dismiss

In 1997, a grand jury in the District of New Mexico indicted Mr. Valadez and several other defendants on charges involving the distribution of cocaine. The indictment named Mr. Valadez as a defendant in the first two counts. Count I charged that he had violated 21 U.S.C. § 846, 21 U.S.C. § 841 (a)(1), and 18 U.S.C. § 2 by conspiring to distribute cocaine between approximately March 9, 1997 and March 14, 1997. Count II charged that he had violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) on March 10, 1997 by possessing five kilograms or more of cocaine with the intent to distribute it.

Mr. Valadez entered a plea of not guilty and the case proceeded to trial before United States District Judge Martha Vasquez in October 1997. On the second day of

trial, Judge Vasquez granted a mistrial. Over the government's objections, she ruled that the prosecutor exceeded the scope of permissible inquiry in questioning an expert witness. See United States v. Valadez-Camerena, 163 F.3d 1160, 1162 (10th Cir. 1998). Because of the system of rotating judicial assignments adopted by the District of New Mexico for cases on its Las Cruces calender, Chief United States District Judge John Conway conducted the post-trial proceedings.

On November 3, 1997, Mr. Valadez moved to dismiss the indictment, arguing that a retrial would subject him to double jeopardy. On November 4, 1997, Chief Judge Conway denied the motion to dismiss. On the same day, Mr. Valadez filed a notice of appeal of the order denying the motion to dismiss.

On November 5, 1997, the government filed a motion requesting that the district court make the additional finding that Mr. Valadez's motion to dismiss was frivolous. Because it had to wait for a transcript of the trial, the government did not submit a memorandum in support of its motion for additional findings until November 18, 1997.

On November 19, 1997, Chief Judge Conway held a hearing on the government's motion for further findings. At the hearing, the court announced its intention to enter a new order, nunc pro tunc, stating that Valadez's motion to dismiss on the basis of double jeopardy was "totally frivolous" and without merit. Aplee's Br., Ex. E at 12, 14 (Transcript of Nov. 19, 1997 hearing). Chief Judge Conway then entered such a nunc pro tunc order, making it retroactive to November 5, 1997 (the date after the order denying

3

Mr. Valadez's motion to dismiss the indictment). The order rejected Mr. Valadez's argument that it lacked jurisdiction:

> The Court finds that there was absolutely no evidence of any attempt by the Government in this case to goad the Defendant into moving for a mistrial . . . . The prejudicial testimony elicited by the Government can, at best, be characterized as prosecutorial negligence or mistake . . . . There is no indication the prosecutor intended to subvert the protections of the Double Jeopardy Clause. Consequently, the Defendant's Motion to Dismiss based on Double Jeopardy was frivolous and without merit.

Aplee's Br. at 24 (quoting Rec. doc. 192, Order filed Nov. 19, 1997).

On the same day, Mr. Valadez filed a petition for an emergency writ of prohibition with this court. He asked this court to order the district court to cease all further proceedings in light of his filing of the notice of appeal of the denial of his motion to dismiss the indictment. On December 4, 1997, a two judge panel entered an order denying Mr. Valadez's petition for a writ of prohibition. The panel concluded that Mr. Valadez had failed to demonstrate that his right to the writ was "clear and undisputable" or that "the actions of the [district] court were a clear abuse of discretion." Id., Ex. F (Order filed Dec. 4, 1997).

Mr. Valadez proceeded with his appeal of the district court's denial of his motion to dismiss. In December 1998, this court issued an opinion affirming the district court's decision. See Valadez-Camerena, 163 F.3d 1160. The court reasoned as follows:

> The record here strongly supports the district court's finding that the prosecution did not intend to provoke the defense into

4

moving for a mistrial.  Although the court held the prosecutor elicited inadmissible testimony from the expert witness, there is simply no evidence that the prosecutor was trying to goad the defense into moving for a mistrial.  To the contrary, he seemed unaware of his mistake and contested defendant's mistrial motion, suggesting alternative remedies.

Id. at 1163.

### B.  The second trial

Mr. Valadez's second trial began on February 18, 1998.  United States District Judge James A. Parker presided.

The government's evidence indicated that on March 9, 1997, Mr. Valadez asked a twenty-year-old woman named Norma Tagle to accompany him from Tijuana to Los Angeles.  The two had met six months earlier.  Ms. Tagle testified that she agreed to accompany Mr. Valadez because she "had a serious problem at my home" and "wanted . . . to get out."  Rec. vol II, at 171.  Mr. Valadez paid for the Immigration and Naturalization Service documents necessary for the two of them to enter the United States.

Later on the same day, Mr. Valadez changed his request:  he asked Ms. Tagle to fly with him to Ciudad Chihuahua.  He told her that he was the manager of a shoe store there.  Ms. Tagle agreed, and she and Mr. Valadez flew to Ciudad Chihuahua and checked into separate hotel rooms.  Mr. Valadez then suggested that they go sightseeing in the town of Nueva Casas Grandes.  He drove a 1993 Ford Grand Marquis, which Ms.

5

Tagle saw for the first time that evening.

Ms. Tagle and Mr. Valadez arrived at Nueva Casas Grandes around midnight and again checked into separate rooms at a hotel. The next morning, Mr. Valadez told Ms. Tagle that they would cross into the United States and eat breakfast in Deming, New Mexico. Ms. Tagle thought that after eating breakfast they would return to Nueva Casas Grandes, go sightseeing, and then fly back to Cuidad Chihuahua.

On the morning of March 10, 1997, Mr. Valadez and Ms. Tagle drove the 1993 Ford Grand Marquis into the United States at the Columbus, New Mexico Port of Entry. They proceeded north on New Mexico Highway 11 toward Deming. Thirteen miles from the border, they reached a United States Border Patrol permanent checkpoint. Joseph Muniz, the primary agent on duty, questioned them about their travel plans.

Mr. Valadez responded that the two of them were going to Deming for breakfast and then on to Yuma, Arizona. (According to Ms. Tagle, Mr. Valadez had said nothing to her about going to Yuma until that point.) When Agent Muniz asked about ownership of the car, Mr. Valadez said that he had bought it ten days or a month earlier. However, he could not produce ownership papers or a bill of sale.

Agent Muniz then asked if he could look in the trunk. He explained in trial testimony that, having seen only a backpack in the back seat of the car, he wanted to find out if there was luggage that would indicate that that Mr. Valadez and Ms. Tagle were actually taking a legitimate sightseeing trip. Mr. Valadez consented.

6

When Agent Muniz opened the trunk, he observed that it was completely empty of luggage and contained only a fire extinguisher, a CD player, and green air freshener. Agent Muniz had also observed air fresheners in the interior of the car, one hanging on the cigarette lighter and the other on the hood release.

His suspicions growing, he directed Mr. Valadez and Ms. Tagle to proceed to the secondary area. Agent Muniz brought a canine colleague to the car, and Mr. Valadez consented to an inspection. The dog alerted to the floorboard. Examining the area where the dog had alerted, Agent Muniz noticed that the floorboard was significantly thicker that normal. He found a drain plug, opened it, and saw packages in a hidden compartment. He then arrested Mr. Valadez and Ms. Tagle.

Border patrol agents ultimately discovered sixty-two packages in the 1993 Grand Marquis. They contained 59.5 grams of cocaine with a strength of about 94% and an approximate value of $885,000. Mr. Valadez made a post-arrest statement that he was in the shoe business and that he had purchased the Grand Marquis for $3,000.

Thirty minutes after Mr. Valadez and Ms. Tagle reached the secondary checkpoint, another white Ford Grand Marquis approached from the south. The second car had a Chihuahua license plate and was driven by a man, Martin Hinojosa, who was accompanied by a wife and three children. After conducting a search at the secondary checkpoint, the border patrol agents discovered sixty-one packages of cocaine containing approximately the same amount of cocaine as was found the car driven by Mr. Valadez.

7

In the following days, the Border Patrol agents discovered several other loads of cocaine in cars entering the United States. On March 11, 1997, the agents found cocaine in a white Ford Taurus--in a compartment similar to the ones in the two other cars. On March 22, 1997, they stopped a white Ford Topaz coming from Nueva Casas Grandes with Chihuahua plates. They found cocaine in that car in an amount within 2/10s of a gram of the amount contained in Mr. Valadez's car. In both of these instances, as well as in the seizures made on March 10, 1997, the cocaine was contained in plastic bags bearing similar designs depicting either a dove or a leopard.

The government introduced expert testimony at trial indicating that all of designs on the plastic wrappings were made from the same device. The government also presented testimony that each of the four cars stopped at the checkpoint contained secret compartments in the roof and the floor that reduced the vertical dimensions of the passenger compartment. After seizing the third load of cocaine on March 11, 1997, border patrol agents attempted to make a controlled delivery of drugs in California. Although they were not successful, they did obtain a Ford Taurus station wagon with plates from the Mexican state of Chihuahua. Like the four vehicles stopped at the checkpoint near Columbus, New Mexico, the station wagon had hidden compartments in the floor and in the roof.

## II. DISCUSSION

## A. Jurisdiction to proceed with the second trial

Mr. Valadez first argues that his filing of a notice of appeal of the district court's denial of his motion to dismiss the indictment on double jeopardy grounds divested the district court of jurisdiction to proceed with the second trial. He seeks an application of the general rule that "the district court is divested of jurisdiction to proceed to trial by the filing of a notice of interlocutory appeal raising a double jeopardy . . . issue." Stewart v. Donges, 915 F.2d 572, 576 (10th Cir. 1990). The district court's determination that it had jurisdiction to proceed with the retrial is a legal conclusion that we review de novo. See United States v. McAleer, 138 F.3d 852, 855 (10th Cir.), cert. denied, 119 S. Ct. 133 (1998).

As Mr. Valadez acknowledges, see Aplt's Br. at 9, there is an exception to the general rule divesting the district court of jurisdiction. "[W]here . . . the district court has considered the double jeopardy claim after a hearing and, for substantial reasons given, found the claim to be frivolous, the court should not be held divested of jurisdiction by [a double jeopardy] appeal." United States v. Hines, 689 F.2d 934, 937 (10th Cir. 1982).

That exception arises out of the competing considerations involved when a defendant seeks to appeal the denial of a double jeopardy claim. On the one hand, there are strong policies reasons to allow the appeal to proceed before the trial is scheduled:

> The Double Jeopardy Clause protects the individual against
> more than being subject to double punishment; it is also a
> guarantee against twice being put to trial for the same offense.
> We must further consider the danger of unlawfully subjecting

9

the defendants to the embarrassment, expense, and ordeal and compelling them to live in a continuing state of anxiety and insecurity, as well as the enhancement of the possibility that even though innocent they might be found guilty.

Id. at 936 (citations omitted).  Moreover, "'if a criminal defendant is to avoid exposure to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs.'" Id. (quoting Abney v. United States, 431 U.S. 651 (1977)).

On the other hand, "Rules implementing the Double Jeopardy Clause must also be fashioned in light of the public policy favoring rapid disposition of criminal cases . . . . There must be a reasoned choice so that the divestiture of jurisdiction rule, applicable generally when a defendant files a notice of appeal, should not leave the trial court powerless to prevent intentional dilatory tactics by enabling a defendant unilaterally to obtain a continuance at any time prior to trial merely by filing a motion, however frivolous, and appealing the trial court's denial thereof."  Id. at 936-937.

The frivolousness exception to the general divestment-of-jurisdiction rule seeks a balance between these two competing considerations.  It has been applied by numerous courts.  See e.g., United States v. Brooks, 145 F.3d 446, 456 (1st Cir. 1998); United States Salerno, 868 F.2d 524, 539 (2d Cir. 1989); United States v. Cannon, 715 F.2d 1228, 1231 (7th Cir. 1983).  In cases decided after Hines, this circuit has continued to follow the frivolousness exception to the jurisdictional rule.  See Kamplain v. Curry County Board of Com'rs, 159 F.3d 1248, 1250 (10th Cir. 1998) (citing Hines, and noting

10

that "the district court retained jurisdiction pending this appeal after certifying that the appeal was frivolous"); United States v. Rodriguez-Aguirre, 73 F.3d 1023, 1024 n. 2 (10th Cir. 1996) (citing Hines, observing that a district court order certifying that an appeal was frivolous "had the effect of reinstating jurisdiction in the district court so that the trial could proceed, even while [the defendant's] interlocutory appeal was pending in this court[,]" but further noting that this court had subsequently granted a writ of prohibition temporarily staying the district court proceedings pending the outcome of the interlocutory double jeopardy appeal).

In this case, Mr. Valadez argues that this frivolousness exception is not applicable for several reasons. First, he observes that Chief Judge Conway did not make a finding that the double jeopardy argument was frivolous until after Mr. Valadez filed the notice of appeal. Next, he observes that the judge who conducted the trial (Judge Vasquez) was not the one who issued either the initial order denying his motion to dismiss on double jeopardy grounds or the subsequent order finding the motion to be frivolous. He maintains that it was error for the district court deny his request that Judge Vasquez conduct the proceedings regarding his double jeopardy argument. Finally, he argues that the district court failed to provide substantial reasons for its finding that the motion to dismiss on double jeopardy grounds was frivolous.

We are not persuaded by these arguments. As to the fact that the district court entered its finding of frivolousness after Mr. Vasquez filed his notice of appeal, we note

11

that the same sequence of events occurred in <u>Hines</u>.  There, after the district court overruled double jeopardy motions on August 20th, the defendants appealed on August 25th and 27th.  The district court did not enter an order concluding that the double jeopardy motions were frivolous until September 14th.  <u>See</u> <u>Hines</u>, 689 F.2d at 936.  Yet, in spite of the fact that the frivolousness finding was made after the filing of the notice of appeal, we concluded that the district court retained jurisdiction over the case.

Mr. Valadez suggests that <u>Hines</u> is distinguishable because, after they filed notices of appeal of the denial of their double jeopardy motions, the defendants "moved for abatement of the district court proceedings in the district court, pending appeal." <u>Id.</u> at 936.  According to Mr. Valadez, the filing of the motions for abatement indicates that the <u>Hines</u> defendants submitted themselves to the jurisdiction of the district court, thereby authorizing the district court to make its findings of frivolousness.  He notes that he filed no such motion for abatement here.

In our view, the filing of the motions for abatement in <u>Hines</u> does not affect the jurisdictional analysis.  There is no indication in the <u>Hines</u> opinion that it was the filing of these motions that vested the district court with the authority to rule on the double jeopardy motions.  Moreover, Mr. Valadez cites no authority for the general proposition that the filing of a motion for abatement affects the jurisdiction of a federal district court to rule on the frivolousness of a prior motion.  In the absence of such authority, we conclude that, just as in <u>Hines,</u> the district court retained authority to rule on the

12

frivolousness of the double jeopardy motion after the filing of the notice of appeal.

Mr. Valadez's objection to Chief Judge Conway (rather than Judge Vasquez) entering the finding of frivolousness is similarly unpersuasive.  As the government notes, it prepared a transcript of the first trial and submitted it to Chief Judge Conway.  At the hearing, Chief Judge Conway stated that he had read the transcript. See Aple's Br., Ex. E, at 3, 15 (Transcript of Nov. 19, 1997 hearing).  There is no reason to presume that Judge Conway was unable to assess the alleged frivolousness of the double jeopardy argument by reviewing the transcript and the relevant legal authorities, and Mr. Valadez fails to specify what information unavailable to Chief Judge Conway (because he did not preside at trial) could have affected the analysis of the frivolousness issue.

Finally, we also disagree with Mr. Valadez that Chief Judge Conway failed to provide substantial reasons for his finding that the double jeopardy motion was frivolous. Chief Judge Conway conducted a hearing and entered a written order that characterized the prosecutor's conduct as "negligence or mistake" and concluded that "there was absolutely no evidence of any attempt by the Government in this case to goad the Defendant into moving for a mistrial."  Aplee's Br. at 23-24.   These findings sufficiently explain the basis for the conclusion that Mr. Valadez's  double jeopardy motion was frivolous.  Moreover, the district court's findings are further supported by our conclusion in the prior opinion in this case. See Valadez-Camerena, 163 F.3d at 1163 ("The record here strongly supports the district court's finding that the prosecution did not intend to

13

provoke the defense into moving for a mistrial.")

Accordingly, because it found Mr. Valadez's motion to dismiss on double jeopardy grounds to be frivolous, we conclude that the district court had jurisdiction to proceed with the second trial.

B. Sufficiency of the evidence on the charge of possession with intent to distribute

Mr. Valadez next argues that the evidence presented by the government at trial is insufficient to support his conviction for knowing possession of cocaine with the intent to distribute it. We review sufficiency of the evidence claims de novo, asking "only whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir. 1996) (internal quotation marks and citations omitted). We determine whether the evidence is sufficient "by 'consider[ing] the collective inferences to be drawn from the evidence as a whole.'" United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997) (quoting United States v. Hooks, 780 F.2d 1526, 1532 (10th Cir. 1986)). Here, we must apply that standard to the elements that the government was required to prove in order to establish a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A): (1) that Mr. Valadez knowingly possessed cocaine; (2) with the specific intent to distribute it. See United States v. Gonzales, 65 F.3d 814, 818 (10th

14

Cir. 1995).

In challenging the sufficiency of the evidence, Mr. Valadez focuses on the element of knowing possession. He maintains that although there is no dispute that he had possession and control over the 1993 Grand Marquis, the government failed to prove that he knew about the cocaine. He urges us to apply a rule that knowledge of drugs cannot be inferred merely from the fact that a defendant has control over a car in which the drugs are concealed. See Aplt's Br. at 17 (citing United States v. Resio-Trejo. 45 F.3d 907 (5th Cir. 1995)). Turning to the evidence introduced at trial, Mr. Valadez argues that the alleged unusualness of his itinerary from Mexico to the United States does not establish that he knew about the cocaine. He also catalogues evidence that was not introduced: there was no evidence that he nervous, no evidence that the compartments in the Grand Marquis were obvious upon a visual inspection, and no evidence that there was any detectable smell of contraband coming from the car.

We are not persuaded by Mr. Valadez's reading of the record. As the government contends, there is substantial circumstantial evidence from which a reasonable jury could conclude that Mr. Valadez knew about the cocaine. See United States v. Hernandez-Rodriguez, 57 F.3d 895, 899 (10th Cir. 1995) (relying on circumstantial evidence to conclude that there was sufficient evidence to support a conviction for knowing drug possession). Here, a border patrol agent testified that the Grand Marquis had a lowered ceiling and a raised floorboard, both of which would be obvious to the driver. Mr.

15

Valadez gave inconsistent accounts of his travel plans, telling Ms. Tagle that he wanted to eat breakfast in Deming and telling the border patrol that he and Ms. Tagle were going to Yuma, Arizona. The contents of the trunk of the Grand Marquis--air fresheners but no luggage--were arguably inconsistent with Mr. Valadez's account of his travel plans and suggestive of an effort to conceal the drugs contained in the hidden compartment. We therefore conclude that the evidence is sufficient to support Mr. Valadez's conviction for knowing possession of cocaine.

### C. Sufficiency of the evidence on the conspiracy charge

Finally, Mr. Valadez advances a similar sufficiency of the evidence challenge to his conspiracy conviction. He argues that the similarities between the five cars seized over a two week period (and the packaging of the cocaine in four of those cars) do not establish that he was involved in a conspiracy.

In order to prove that Mr. Valadez conspired to distribute cocaine in violation of 21 U.S.C §§ 841 (a)(1) and 846, the government is required to prove the following elements: (1) that Mr. Valadez entered into an agreement with another person to break the law; (2) that Mr. Valadez knew of the essential objectives of the conspiracy; (3) that Mr. Valadez was knowingly and voluntarily involved in the conspiracy; and (4) that there was an interdependence among the alleged conspirators United States v. Lopez, 100 F.3d 113, 118 (10th Cir. 1996). "The jury may infer an agreement from circumstantial

16

evidence that indicates concerted action in furtherance of a common purpose." United States v. Dozal, 173 F.3d 787, 797 (10th Cir. 1999). "It may also infer guilty knowledge from the surrounding circumstances and presume that a defendant acting in furtherance of a conspiracy is a knowing participant therein." Id.

We agree with Mr. Valadez that there is no direct evidence in the record linking him to other individuals who were part of the alleged conspiracy. The government did not allege that Ms. Tagle was part of the conspiracy, and, although there were striking similarities in the transporting of the cocaine by Mr. Valadez and by the drivers of the three other cars stopped on Highway 11 around the same period of time, the government did not present evidence indicating that Mr. Valadez was involved with these other shipments.

Nevertheless, there is evidence in the record from which a reasonable jury could conclude that Mr. Valadez's driving the Grand Marquis containing 59.5 kilograms of cocaine was part of a conspiracy. As the government notes, although Mr. Valadez told Ms. Tagle that he did not have the $200 necessary to travel to Los Angeles, he was able to pay for plane tickets and separate hotel rooms on the same day. When Mr. Valadez and Ms. Tagle arrived in Ciudad, Chihuahua on March 9, 1997, Mr. Valadez somehow obtained the keys to the 1993 Grand Marquis. A jury could conclude from this evidence that other unknown individuals assisted with Mr. Valadez's and Ms. Tagle's trip from Tijuana into the United States. Combined with the evidence that Mr. Valadez knowingly

17

possessed cocaine with the intent to distribute it, a jury could further conclude that Mr. Valadez entered into an agreement with another person to break the law, that he knew of the essential objectives of the conspiracy, that he was knowingly and voluntarily involved in the conspiracy, and that there was an interdependence among the alleged conspirators. See Lopez, 100 F.3d at 118. The large amount of cocaine discovered in the car driven by Mr. Valadez provides further support for the jury's verdict on the conspiracy charge. See United States v. Howard, 966 F.2d 1362, 1364 (10th Cir. 1992) (observing that "the huge quantity of crack cocaine involved in this case permits an inference of conspiracy, but by itself this is not enough to convict defendant" but adding that the evidence of conspiracy was further supported by the defendant's lack of financial resources and by the fact that the jury could infer that the cocaine had been shipped by another, unknown conspirator).

Accordingly, we conclude that the evidence is sufficient to support Mr. Valadez's conviction on the conspiracy charge.

III. CONCLUSION

For the reasons set forth above, we affirm Mr. Valadez's conviction.

18

Entered for the Court,

Robert H. Henry
Circuit Judge