# United States Court of Appeals

## For the First Circuit

No. 03-1442, 03-1443

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

PAUL DeCOLOGERO, a/k/a Big Paul, a/k/a Paulie,

Defendant-Appellant/Cross-Appellee.
_____

JOHN P. DeCOLOGERO, JR., a/k/a Little John, a/k/a John-John,
PAUL J. DeCOLOGERO, a/k/a Young Paul,
DEREK CAPOZZI,
JOSEPH F. PAVONE,
DANIEL G. TSOUKALAS,

Defendants/Cross-Appellees,

and

IN RE:  UNITED STATES OF AMERICA, Petitioner.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Stahl, Senior Circuit Judge.

Janice Bassil, by appointment of the court, with whom Andrew D'Angelo and Carney & Bassil, P.C. were on brief for Paul DeCologero, a/k/a Big Paul, Paulie.

Timothy Q. Feeley, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, Christopher F. Bator and Ernest S. DiNisco, Assistant United States Attorneys, were on brief and petition for a writ of mandamus for the United States.

Joan M. Griffin, by appointment of the court, with whom Cooke, Clancy & Gruenthal, LLP and Paul F. Markham were on brief for John P. DeCologero, Jr. and Joseph F. Pavone.

Roger Witkin, by appointment of the court, on brief for Paul J. DeCologero, a/k/a Young Paul.

Terrance J. McCarthy, by appointment of the court, on brief for Derek Capozzi.

_____

April 12, 2004

_____

**BOUDIN, Chief Judge**.  Before us are a pair of interlocutory appeals in a criminal case.  Both grow out of a 23-count federal indictment filed on October 17, 2001, charging Paul A. DeCologero and six associates with criminal racketeering in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (2000),[1] conspiracy to violate RICO, id. § 1962(d) and an array of related crimes.  We refer to Paul A. DeCologero as "DeCologero" even though several co-defendants have the same last name.

The government alleged that DeCologero headed a criminal enterprise ("the DeCologero crew") that used brutal tactics to gain control of a portion of Boston's drug trade and murdered a nineteen-year-old woman (Aislin Silva) when the members thought she might betray them.  In addition to the RICO counts, the indictment specified a number of federal crimes charged in separate counts involving drugs, guns, robberies, and--in the case of the slain woman--murder for the purpose of witness tampering.

---

[1]18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

RICO violations require not only participation in a criminal enterprise but also participation in a "pattern of racketeering activity," which in turn requires proof of at least two of a list of specified federal or state crimes (e.g., murder, extortion, robbery, drug trafficking). 18 U.S.C. §§ 1961(1), (5) (2000). In jargon, such acts are called "predicate acts" or "racketeering acts" ("RAs"), and, in this indictment, a number of the acts charged as federal crimes in separate counts of the indictment were restated as RAs in support of the RICO counts. A table listing the RAs is attached to this decision.

Nominally the indictment identified fourteen separate RAs, but several had subparts, each constituting a sufficient predicate act under RICO; for example, the attempted and ultimately successful murder of the woman was expressed in RA 1 as five separate crimes (e.g., subpart 1 was conspiracy to murder under state law, subpart 2 was attempt to murder under state law). The indictment thus effectively contained thirty-eight predicate acts only partly overlapping with the substantive counts because some counts were not RAs and some RAs (e.g., state crimes) were not counts. Different defendants were implicated in different RAs; only Paul A. DeCologero was implicated in all.

Four years before the present indictment was filed, DeCologero had been acquitted of RICO violations in United States v. Carrozza, Crim. No. 97-40009-NMG (D. Mass. 1999). Following the

-4-

present indictment, DeCologero moved to dismiss the new RICO charges against him (and one drug conspiracy count) on double jeopardy grounds. The district court rejected this claim, finding that the RICO violations alleged in Carrozza were different than those charged in the current case. DeCologero now appeals from this ruling under 28 U.S.C. § 1291 (2000), the denial of a double jeopardy defense being immediately appealable. Abney v. United States, 431 U.S. 651, 662 (1977).

At one of the pre-trial hearings, the district court had expressed concern that the scope of the case--the number of counts, RAs and criminal offenses--made "charging a jury and having them understand virtually impossible." Then, in an oral ruling at a further conference, the district court without further explanation sua sponte divided the case (as described immediately below) into two separate trials. On motion by the government for reconsideration, the court entered a written order adhering to the separation, saying:

> [I]t is necessary to divide this case into separate trials, pursuant to this Court's inherent "authority and responsibility for managing . . . trials before it so as to protect the interests of the parties and the public in just determination of a criminal proceeding with 'simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.'" United States v. Shea, 750 F. Supp. 46, 49 (D. Mass. 1990) (quoting Fed. R. Crim. P. 2).

The district court's ruling divided the charges in the indictment into two separate trials, ordering that three substantive counts involving robberies and unlawful possession of firearms be postponed until a second trial at some unspecified date.[2] Further, the court ordered that four of the fourteen racketeering acts that the government included as predicate acts for the RICO charges be postponed until this second trial. See attached chart. This left ten RAs and seventeen substantive counts for the first trial (the government had voluntarily dismissed three firearms counts).

The government then filed a cross-appeal from the court's decision to postpone four of the RAs until a later trial, arguing that this order effectively dismissed and foreclosed the four postponed RAs since double jeopardy doctrine would prevent the government from bringing RICO charges based on these RAs in a later trial. Alternatively, the government said that the order exceeded the district court's case management authority. The district court stayed trial pending the resolution of the appeals.

Before us now are three difficult questions: the merits of DeCologero's double jeopardy claim (which is clearly appealable now under Abney, 431 U.S. at 662); whether we have jurisdiction

---

[2]The court did not invoke Fed. R. Crim. P. 14 and "sever" the deferred counts into a separate case with a separate docket number; instead, it merely postponed their trial until a second phase of the same case.

-6-

over the government's cross-appeal contesting the case management order (the defendants dispute jurisdiction); and, if so, whether the district court exceeded its authority in its division of the case insofar as it limited the RAs available to the government in the first trial.  We address the questions in that order.

Double Jeopardy.  DeCologero argues that, having been acquitted of the RICO charges in Carrozza, he is shielded by the Constitution's prohibition of double jeopardy from the RICO charges (although not necessarily from the non-RICO counts) in the present case.  This is so if, but only if, the RICO charges in the two cases are "the same."  U.S. Const. amd. V; see, e.g., United States v. Marino, 277 F.3d 11, 39 (1st Cir. 2002).  Based on a comparison of the two indictments as drafted and the proffer of evidence by the government, we conclude that the new RICO charges are not barred.

The Carrozza indictment charged nine defendants with conducting the affairs of "the Patriarca Family of La Cosa Nostra" through a pattern of racketeering.  La Cosa Nostra is the notorious crime syndicate also known as the mafia.  The "Patriarca Family," a New England branch of this organization, was headed by Raymond J. Patriarca until 1990, at which point Francis P. Salemme was the heir-apparent.  The Carrozza defendants were charged with attempting "to usurp control of the Patriarca Family" from Salemme

after Patriarca's death. See Marino, 277 F.3d at 19-21 (detailing evidence in Carrozza case).

The Carrozza indictment covered the period from 1989 to 1994, although evidence of events occurring through 1998 was presented at trial. DeCologero was charged in eight substantive counts, including RICO and RICO conspiracy, conspiracy to commit murder and attempted murder, various firearms charges, and a cocaine distribution conspiracy. The RICO counts listed him as a participant in only three of the fourteen RAs: conspiracy to murder fourteen individuals, attempted murder, and conspiracy to possess cocaine with intent to distribute. He was acquitted of all charges in 1999.

The present indictment charges the defendants with participating in a nominally different enterprise--the "DeCologero Crew"--said by the government to be "a separate entity from the Patriarca La Cosa Nostra ('LCN') Family, yet . . . structured in a similar manner to a crew or regime of La Cosa Nostra" and "aligned with" the Carrozza faction of the Patriarca Family. According to the charge, the DeCologero Crew's aim was "controlling, supervising, and financing illegal activities," including generating money through robbery and drug sales "for the personal use of members . . . and to build up a war chest of firearms, weapons, and ammunition which was to be used, in part, to support the" Carrozza faction.

If the double jeopardy problem turned solely on whether the two cases involved the same enterprise, we would be faced with a hard question. The RICO statute loosely defines an "enterprise" to include not only any legal entity (e.g., a corporation) but also "any union or group of individuals associated in fact." 18 U.S.C. § 1961(4). Although the DeCologero indictment alleges that the Carrozza faction and DeCologero crew were separate enterprises, the proffered evidence could support the view that both were part of a vertically organized endeavor, with DeCologero somewhere in the middle of the organizational pyramid.

Past cases have stressed that conspiracies cannot be artificially broken up for the purpose of bringing separate cases, see Braverman v. United States, 317 U.S. 49, 53 (1942), and there is no reason why the rule should be any different for RICO enterprises. But whether there was one enterprise or two need not be resolved. Every circuit to have examined the issue has agreed that double jeopardy only bars successive RICO charges involving both the same enterprise and the same pattern of racketeering activity.[3] In our view the current RICO charges do involve a different pattern than the old.

_____

[3]See United States v. Ciancaglini, 858 F.2d 923, 928-29 (3d Cir. 1988); United States v. Langella, 804 F.2d 185, 188-89 (2d Cir. 1986); United States v. Ruggiero, 754 F.2d 927, 931 (11th Cir.), cert. denied, 471 U.S. 1127 (1985); United States v. Russotti, 717 F.2d 27, 33 (2d Cir. 1983), cert. denied, 465 U.S. 1022 (1984); United States v. Dean, 647 F.2d 779, 787-88 (8th Cir. 1981).

-9-

In deciding whether two patterns are "the same" for double jeopardy purposes, other circuits all employ some variation of a "totality of the circumstances" analysis, using factors akin-- although not necessarily identical--to those used in evaluating the identity of conspiracies. See United States v. Gomez-Pabon, 911 F.2d 847, 860 (1st Cir. 1990) (conspiracy), cert. denied, 498 U.S. 1074 (1991); United States v. Dean, 647 F.2d 779, 788 (8th Cir. 1981) (RICO). These factors include the time, the place, the people, and the nature and scope of the activities involved in each indictment.

Here, little overlap exists in the type of crimes centrally charged as racketeering acts in the two cases. The Carrozza indictment RAs focused on the systematic murder of rival mafia members--a pattern of murders and attempted murders of members of the Salemme faction (including attempted murder of Francis Salemme) to seize control of the Patriarca crime family. The specific RAs alleged include conspiracy to murder fourteen people, attempted murder of six, and successful murder of two, as well as a cocaine conspiracy and several gambling-related charges. In the present indictment, the only murder alleged was committed simply as part of a failed cover-up attempt incident to the crew's main activities.[4]

_____

[4]According to the indictment and the government's summary of evidence, Silva permitted crew members to store weapons at her apartment; the police raided the apartment on a tip; and, afraid

-10-

The murder aside, the RAs alleged in the current case centered on robbery and drug trafficking, primarily the former. By contrast, not a single Carrozza RA involved robbery. Thus, while the pattern in Carrozza could be viewed primarily as murders connected by an aim to secure power, the pattern in the present case appears to be a more conventional collection of robberies and drug trafficking offenses, the single murder being merely a means of protecting the conspiracy from the police.

The other factors--similarity of persons, time, and place--are less clear-cut but do not preclude the conclusion that the two patterns are different. The Carrozza indictment identified eight defendants; Paul is the only member of the DeCologero crew who was charged in Carrozza, there as a subordinate member of the Carrozza faction rather than as a leader of his own crew. Still, the Carrozza indictment named one "FNU [first name unknown] DeCologero" among the thirty unindicted co-conspirators, so at least one (and perhaps more) of the other defendants in the current case may have been involved.

As for time and place, the locations involved in the two indictments are basically the same--the greater Boston area--but the time periods overlap only slightly. The Carrozza indictment alleged RICO violations that ran from 1989 though 1994, although at

---

Silva might testify, crew members acting under orders from DeCologero killed Silva.

-11-

trial the government offered proof that the conspiracy to obtain power continued through January 1998. The present indictment alleges that the DeCologero crew operated from 1995 through the beginning of 1997. Again, this is consistent with the view that there may have been one enterprise but does not disturb the conclusion that there were two patterns.

In summary, all of the incidents constituting substantive non-RICO crimes and all of the RAs in the present indictment are different from those charged in the Carrozza case. Whether the enterprise in the two cases is "the same" may be open to debate, but "the pattern" is different, which defeats the double jeopardy claim. Whether any of the background evidence offered in the first trial is relevant and admissible in the second is a matter for the district judge.

DeCologero argues alternatively that collateral estoppel prohibits the present RICO charges against him or at the very least precludes the government from making any reference to the "war" for control of the Patriarca family. See Ashe v. Swenson, 397 U.S. 436, 443-44 (1970). Our authority on DeCologero's appeal is based on his double jeopardy claim and we decline to consider other issues even if we could. See Swint v. Chambers County Comm'n, 514 U.S. 35, 50-51 (1995). The district court can consider in due

course what effect, if any, collateral estoppel doctrine may have.[5]

Appeal of the scheduling order. The government's cross-appeal is directed to the scheduling order issued sua sponte by the trial court, citing the court's "inherent authority and responsibility for managing trials." The court ordered that three substantive counts and four racketeering acts be postponed until a second trial at some unspecified later date; the rest of the case would be tried at the first trial. The government's motion for reconsideration was denied.

On its interlocutory appeal, the government does not formally contest the postponement of substantive counts to a second trial, but only the exclusion of four RAs. The government says that if this court orders the four RAs to be reinstated for the first trial, the district court may well decide to reinstate the postponed counts directed to the same acts; obviously, it would do little to reduce complexity at the trial if the counts are postponed but the RAs remain to be proven by the same evidence.

An order severing or deferring counts is generally not immediately appealable. See United States v. Bloom, 149 F.3d 649, 657 (7th Cir. 1998). By contrast, the court's treatment of the RAs presents a puzzle on both scores--appealability and the merits--and

---

[5]If the Carrozza verdict was a general one, DeCologero may well have considerable difficulty showing what factual findings underlay his earlier acquittal. United States v. Morris, 99 F.3d 476, 481 (1st Cir. 1996); United States v. Aguilar-Aranceta, 957 F.2d 18, 25 (1st Cir. 1992); Russotti, 717 F.2d at 35.

we start naturally with the former. To understand just what the district court did and how it matters requires additional background--pertinent both to the jurisdictional question and to the merits.

As explained earlier, the original indictment listed fourteen RAs but, with subparts, amounted effectively to thirty-eight different acts.[6] DeCologero was charged in all fourteen of the RAs; of the other defendants, one was named in nine, one in seven, and the remaining two defendants were named in four each. See attached chart. The RAs not only involved thirty-eight separate criminal acts but were violations of over a dozen different federal and state statutes (e.g., murder, robbery) each of which would require instructions to the jury as to the elements of the crime.

Before making her sua sponte ruling, the district judge expressed fear that the level of complexity of the case "makes charging a jury and having them understand virtually impossible," and noted that she had a "fervent desire to try a piece of the case first." In her later ruling, she selected two specific RAs-- numbers 6 and 8 on the attached chart--to be "postponed" until some unspecified later date (presumably the same time as the trial of

---

[6]The district court stressed that there were thirty-eight, but government's grouping of the predicate acts into fourteen sets may more accurately reflect the level of factual complexity because the RAs in each group all relate to the same criminal episode (e.g., a particular robbery), albeit fragmented into different crimes.

-14-

the severed substantive counts).   Both excluded RAs involved robberies in violation of the same state and federal statutes as the robberies charged in RAs 4 and 5, which were not postponed.

The court also ordered the government to select two more RAs to be postponed, listing four from which to choose--three of these RAs involved robberies and one involved conspiracy to collect credit by extortionate means.  The criterion for exclusion of both counts and RAs appeared to be how closely related they were to the murder of Ms. Silva; the district judge repeatedly asked the government to explain how the counts and RAs related to Silva, and (for instance) stated that two specific counts would be included in the first trial "on the representation that those are guns in Silva's apartment.  If they are not, then those counts do not go forward."

The statute governing appeals by the United States in criminal cases, 18 U.S.C.A. § 3731 (2003), allows interlocutory appeals in specified situations, two of which are invoked by the government in this case.  The first paragraph of the statute allows (in pertinent part) an appeal from a district court's dismissal of an indictment "as to any one or more counts, or any part thereof"-- the "any part" language having been added in 2002 in part to resolve a circuit split about the appealability of dismissed RAs. See Pub. L. No. 107-273, div. B, tit. III, § 3004, 116 Stat. 1758 (2002); H.R. Rep. No. 107-685, § 3004 (2002).

The second paragraph of the statute permits inter alia an appeal from a district court order "suppressing or excluding evidence," if made before trial (specifically, "not after the defendant has been put in jeopardy"). 18 U.S.C. § 3731. The most familiar target of such appeals are pre-trial orders suppressing evidence as unlawfully seized; but the provision equally allows appeal from in limine orders excluding evidence on any ground (e.g., because prejudice outweighs probative value under Fed. R. Evid. 403). United States v. King, 827 F.2d 864, 866-67 (1st Cir. 1987).

At first blush, the statute's first paragraph appears to cover the district court's order excluding RAs as dismissal of "part" of a count. Of course, the district court here did not purport to "dismiss" the RAs but--as with the three substantive counts--only to "postpone" them to a second trial. On the principle that substance rather than form should prevail, this labeling would not bar appeal under the first paragraph if the postponement were effectively a dismissal. See United States v. Zabawa, 39 F.3d 279, 283 (10th Cir. 1994); United States v. Nakashian, 820 F.2d 549, 550 (2d Cir. 1987).

In our own case, the deferred substantive counts were not formally dismissed but explicitly reserved for a second trial, and could in fact be tried later. The opportunity to employ the counterpart acts as RAs in a second RICO prosecution is more

-16-

doubtful. Under the RICO statute, predicate acts are offered to satisfy the "pattern of racketeering" element of the crime. On the government's premise that all of the predicate acts charged comprised the same pattern, a second RICO prosecution based on the postponed acts would arguably itself be barred by double jeopardy principles, the "acts" being different but the "pattern" being the same. If so, deferral was effectively dismissal.

The defendants have sought to defeat this basis for appeal by agreeing in writing, shortly before oral argument in this court, to waive double jeopardy protection as to the severed RAs so far as necessary to negate the government's double jeopardy argument. Whether this (post-appeal) waiver should be accepted and whether if accepted it fully answers the government's claim that the postponed RAs have effectively been dismissed are interesting questions; but we by-pass them (the waiver is surely a rare situation) because the second paragraph of section 3731 is adequate to support the appeal.

Indeed, while both paragraphs might apply to the same order, the second paragraph is a more apt basis here because the real concern of the parties has little to do with any possible--and highly theoretical--second trial for the postponed RAs. Rather, both sides are mainly interested in the postponement's effect on the first trial--the government because it wants the four RAs to be available to the jury and the defense because it wants them not to

-17-

be available.  Consonantly, the second paragraph's own concern is with the exclusion of evidence in the instant trial (without regard to whether there will ever be another trial).

But have the postponed RAs been "excluded" from evidence in the first trial?  The district court's order and statements are oblique; the RAs were relegated to a second case without a clear statement of the effect on the first, but we think that the district court has in substance told the government that it may rely only upon ten RAs in order to prove the necessary RICO pattern and not the fourteen listed in the indictment.

Defendants say that the excluded RAs might still be admissible for other purposes (such as proving the existence of the enterprise) or perhaps even on a limited basis as to particular defendants, but of course "exclusion" within the meaning of section 3731 need not be a complete exclusion.  Cf. United States v. Ceccolini, 435 U.S. 268, 271-2, 275 (1978) (jurisdiction to review suppression of evidence under § 3731 even though the evidence would still be admissible for impeachment and other purposes).

Such an exclusion of charged RAs to prove the pattern is in our view an exclusion of evidence within the meaning of the second paragraph of section 3731.  See United States v. Mobley, 193 F.3d 492, 495 (7th Cir. 1999) (finding jurisdiction under section 3731's second paragraph to review an exclusion of overt acts offered to prove a conspiracy).  It does not mean that the pattern

could not be proved through other RAs--there are at least two un-excluded RAs charged against every defendant--but it does mean that the government would be deprived of factual episodes that it would otherwise offer to establish the pattern. The RAs are evidence of the pattern, and section 3731 permits an appeal of an order suppressing evidence even if there remains other evidence of the crime.

What little case law exists in this circuit supports our conclusion. See King, 827 F.2d at 866 (jurisdiction to review a district court order excluding evidence of a specific racketeering act); see also United States v. Levasseur, 846 F.2d 786, 787 n.2 (1st Cir. 1988) (suggesting possibility). And, whether or not the district court's order was a formal exclusion, "pretrial orders that have the practical effect of excluding material evidence at trial are appealable under section 3731, regardless of nomenclature." United States v. Brooks, 145 F.3d 446, 454 (1st Cir. 1998).

The merits of the exclusion. The most important issue before us is the district court's claim of authority to sculpt the government's case by limiting the charged RAs that can be proved in this case. The government portrays this as a naked encroachment on the Executive Branch's constitutional authority to conduct prosecutions; the defense, as a simple house-keeping matter no

different than limiting the number of witnesses or the order of presentation. We think both claims are overstated.

Had the district court purported to exclude the evidence because (for example) it thought the acts not worthy of prosecution, it might well be ultra vires, cf. United States v. Armstrong, 517 U.S. 456, 464 (1996), but the court's concern here was with trial management and jury comprehension. Supreme Court cases contain broad statements supporting orders to these ends. See, e.g., Geders v. United States, 425 U.S. 80, 86-87 (1976). Routinely, courts sever counts that the government bundled, limit repetitive witnesses that the government sought to offer, and exclude pieces of its evidence as unduly prejudicial or like reasons.

Similarly, this case differs from those in which, finding that counts had been needlessly multiplied, district courts deferred trial on some of the counts merely to save time. In those situations, admittedly on aggravated facts, two circuits have said firmly that trial courts have no authority to carve down the government's case for the court's own convenience because the judge regarded it as overcharged. See Zabawa, 39 F.3d at 284-85; United States v. Giannattasio, 979 F.2d 98, 100-01 (7th Cir. 1992) (Posner, J.). In our own circuit, dicta in United States v. Leichter, 160 F.3d 33, 36-37 (1st Cir. 1998), assumes that the

trial court has authority to postpone excessive counts but does not deal with the exclusion of evidence.

In our view, telling the government that in order to simplify the trial it cannot prove RICO acts for which it has secured an indictment (and which are otherwise proper under the statute and rules of evidence) is more than mere house-keeping. True, limits on the time allowed to each side, or the number of witnesses, can have the effect of restricting each side's proof; and such orders have been upheld, usually relying upon a district court's inherent authority.[7] But in such cases each side still retains control of <u>what</u> it will prove in the time available.

Even courts generous in allowing other trammels have been cautious about intruding on counsel's ability to shape the case; one court said that "while courts certainly should have flexibility in reassessing imposed time limits, they ordinarily should allow a party to fill its allotment with whatever evidence that party deems appropriate." <u>Duquesne Light Co.</u> v. <u>Westinghouse Elec. Corp.</u>, 66 F.3d 604, 610 (3rd Cir. 1995); <u>see also</u> <u>United States</u> v. <u>Hildebrand</u>, 928 F. Supp.

---

[7]<u>E.g.</u>, <u>Geders</u>, 425 U.S. at 86-87; <u>Duquesne Light Co.</u> v. <u>Westinghouse Elec. Corp.</u>, 66 F.3d 604, 609-10 (3d Cir. 1995); <u>MCI Communications Corp.</u> v. <u>Am. Tel. & Tel. Co.</u>, 708 F.2d 1081, 1171 (7th Cir.), <u>cert. denied</u>, 464 U.S. 891 (1983). Sometimes courts rely upon Fed. R. Evid. 403 rather than inherent authority, although inherent authority appears a slightly better fit where the issue is the contours of the trial rather than the inherent quality of a piece of evidence.

841, 848 (N.D. Iowa 1996). This concern may be especially sharp in a criminal case.

Our own case illustrates the potential impact of such exclusions. As to DeCologero the government had a fair number of predicate acts to offer even after the district court order, but as to other defendants it had only three, four, or five remaining after the exclusion. While two is the absolute minimum for a conviction, not just any two predicate acts will do: the relationship between the acts must form a "pattern" based on elusive criteria.[8] If the district court's order was given effect, the jury might find that the government had proven the remaining acts and yet the case still fail for want of the necessary relationship that an excluded act would have supplied.

In this respect, the present order's treatment of RAs goes well beyond those that, like the orders in Zabawa and Giannattasio, postpone or sever counts; although denying the government the forensic benefit of multiplying counts in a single trial, those orders still preserved the government's right to proceed on the stricken charges in a second proceeding. By

---

[8]H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 238 (1989) ("[T]here is something to a RICO pattern beyond simply the number of predicate acts involved . . . . [T]he mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order. It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged.'"); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 n.14 (1985).

contrast, the outright exclusion of individual RAs substantially weakens the charges that remain in the first trial. By limiting the blocks of evidence that the government may use, this exclusion can deprive the public permanently of rightful convictions. This loss of evidence is not necessarily offset by the dubious possibility of a second trial, also on truncated evidence.

Seeking a solution for a problem with little direct circuit precedent, we are led to this answer: in a RICO case, the exclusion of an RA or other criminal episode in order to make the trial comprehensible for a jury may not be wholly beyond the district court's inherent authority (we need not decide the issue definitively); but it would have to be a last resort where no more conventional method existed to assure a fair trial and where the exclusion rested on detailed and compelling findings. The test, in short, would be one not of convenience but of last-ditch necessity.

Was there in this case an adequately detailed and supportable finding of last-resort necessity for the order excluding RAs? The district judge said that it was "virtually impossible" to instruct the jury, and that "to run a reasonable trial the jurors can understand that is fair to both sides requires a break up of these wide ranging charges." But these conclusions are not supported with any detailed explanation and whether the judge meant that the RAs had to be excluded because there was no other way to provide a fair trial is unclear.

On this record we are unwilling to impute to the judge such a finding of last-resort necessity and, absent some further underpinning, would be unable to uphold it. The present indictment before the order took effect covered six defendants, twenty-three counts, and thirty-eight predicate acts (some overlapping with counts). This is admittedly quite a wingspan, even though most of the crimes were familiar rather than esoteric and the focus is upon a single alleged criminal gang operating in one geographic area over a limited time period.

Yet indictments of comparable or greater complexity are regularly tried. See, e.g., United States v. Boylan, 898 F.2d 230, 236 (1st Cir. 1990) (seven-defendant, fifty-seven-count indictment ruled not so large that a jury was incapable of understanding); United States v. Shea, 211 F.3d 658 (1st Cir. 2000). The government here estimated that the trial would take about two months—a figure far less than the duration of other gangland cases. E.g., United States v. Casamento, 887 F.2d 1141, 1149-50 (2d Cir. 1989) (rejecting arguments that a 17-month trial was too complex for the jury to comprehend).

There are potentially limits to the complexity that a jury can handle: in United States v. Andrews, 754 F. Supp. 1161, 1180 (N.D. Ill. 1990), the district court was faced with a staggering RICO case—a 305-page, 175-count, 38-defendant indictment—and the court broke up the case as part of its formal

Rule 14 severance of trials of particular defendants. But our own case is a fraction of this size and, when the Andrews court had divided the mammoth indictment into separate trials, those units were (on a crude assessment) each about the same size as the entire DeCologero indictment.

While Andrews may have been facially unmanageable (the Seventh Circuit never reviewed this question), this case is not, and so in our view it was insufficient for the district court merely to recite the number of counts, RAs, and different criminal statutes involved and then announce a conclusion. As already noted, the district court stressed that there were thirty-eight predicate acts, but this overstates the number of criminal episodes involved, see note 6, above; in this case the criminal statutes other than RICO are not esoteric; and the district court's exclusion of RAs did not significantly reduce the number on which jury instructions would be required--at most, it reduced the number by one.[9]

Further, there is no showing that the district court had exhausted more conventional means to cope with the case. Rule 14 gives the district judge wide authority to sever defendants, counts, or both, upon a showing of prejudice. Cf. United States v.

---

[9]If the government elected to postpone RA 14 (collection of credit by extortionate means), the court would not have to instruct the jury on 18 U.S.C. § 894(a). Otherwise, the elimination of four RAs would not affect the number of statutes involved.

<u>Bartelho</u>, 129 F.3d 663, 678 (1st Cir. 1997).  In principle, the district court could require that DeCologero be tried alone and solely upon the two RICO counts and the RAs applicable to him, severing all other defendants and counts for a future trial or trials.  Similarly, limits on witnesses and the time allowed to each side are permissible measures.  <u>Duquesne Light Co.</u>, 66 F.3d at 609-10; <u>Sec'y of Labor</u> v. <u>DeSisto</u>, 929 F.2d 789, 796 (1st Cir. 1991).

In this case the district judge did not make findings, or negate alternatives, that would justify the extreme remedy of excluding otherwise properly charged RAs from the initial trial.  In so ruling, we intend no criticism whatever of the experienced and distinguished trial judge who was trying to bring more order into a complex trial.  The limits of trial management authority are inherently uncertain, and existing circuit case law here and elsewhere is virtually a stranger to the precise problem in this case.

For the reasons stated, the order rejecting the double jeopardy defense is <u>affirmed</u>, the trial management order is <u>vacated</u> insofar as it excluded from the indictment or evidence the four individual RAs in question in order to simplify proceedings, and the matter <u>remanded</u> for further proceedings.  Our judgment is without prejudice to severance of counts or parties under Rule 14,

other trial simplification measures, or other issues pertaining to the four RAs that may arise in the course of this case.

It is so ordered.

This chart shows the racketeering acts, numbered in accordance with the indictment. The "Disposition" column lists the effect of the district court's scheduling order upon the RAs. The government was ordered to choose two of the four RAs marked with "Elect" to try at the first trial; the two RAs not selected were to be postponed to a hypothetical second trial, along with the two RAs marked as "Out."

The defendants are identified by their initials, and an "x" in the column under their name means that they were charged in at least one subpart of that RA. The initials P.A.D. stand for Paul A. DeCologero, whom this opinion refers to simply as "DeCologero." The initials J.P.D. stand for John P. DeCologero, Jr.; his father, John P. DeCologero, Sr., also charged in the indictment, pled guilty.

| RA # | P. A. D. | J. P. D. | P. J. D. | D. A. C. | J. F. P. | Description of RA | Disposition |
|------|------|------|------|------|------|-------------------|-------------|
| 1(a-e) | x | | x | x | | Murder, attempted murder, conspiracy to murder, and witness tampering (Aislin Silva) MGL ch. 265, § 1 MGL ch. 274, §§ 2, 6, 7 18 USC § 1512(a)(1)(c) and (2) | IN |
| 2 | x | | x | x | x | Witness tampering (Aislin Silva) 18 USC § 1512(b)(3) and (2) | IN |
| 3 | x | x | x | x | x | Hobbs Act robbery conspiracy (9 victims) 18 USC § 1951 | IN* |
| 4(a-d) | x | x | | | x | Hobbs Act robbery & related charges (Godreau) 18 USC §§ 1951, 1952 21 USC § 841(a)(1) 18 USC § 2 MGL ch. 265, §§ 17, 26 MGL ch. 274, § 2 | IN |

| Count | C1 | C2 | C3 | C4 | C5 | Charge | Disp |
|---|---|---|---|---|---|---|---|
| 5(a-f) | x | | | x | | Hobbs Act robbery & related charges (Stevens)<br>18 USC §§ 1951, 1952<br>21 USC § 841(a)(1)<br>18 USC § 2<br>MGL ch. 265, §§ 17, 26<br>MGL ch. 274, § 2 | IN |
| 6(a-d) | x | x | x | | | Hobbs Act robbery & related charges (Sapochetti)<br>18 USC §§ 1951, 1952<br>MGL ch. 265, § 26<br>MGL ch. 274, § 2 | OUT |
| 7 | x | x | | | | Hobbs Act robbery & related charges (North)<br>18 USC §§ 1951, 1952 | Elect |
| 8(a-e) | x | x | | | | Hobbs Act robbery & related charges (Soccorso & Ramus)<br>18 USC §§ 1951, 1952<br>21 USC § 841(a)(1)<br>18 USC § 2<br>MGL ch. 265, §§ 17, 26 | OUT |
| 9(a-e) | x | x | x | | | Hobbs Act robbery & related charges (Pesaturo)<br>18 USC §§ 1951, 1952<br>21 USC § 841(a)(1)<br>18 USC § 2<br>MGL ch. 265, § 26<br>MGL ch. 274, § 2 | Elect |
| 10(a-b) | x | x | | | | Hobbs Act robbery & related charges (Pollard)<br>18 USC §§ 1951, 1952<br>MGL ch. 265, § 26 | Elect |
| 11 | x | | x | | | Marijuana distribution conspiracy<br>21 USC § 841(a)(1), 846 | IN |
| 12 | x | | x | | | Cocaine distribution conspiracy<br>21 USC § 841(a)(1), 846 | IN |
| 13 | x | x | | | | Possession with intent to distribute cocaine<br>21 USC § 841(a)(1)<br>18 USC § 2 | IN |
| 14 | x | x | | | x | Collection of credit by extortionate means<br>18 USC § 894(a) and 2 | Elect |