**UNITED STATES of America,
Appellant,**

v.

**Philip E. WATSON and Shane
E. O'Hearn, Defendants,
Appellees.**

No. 04–1913.

United States Court of Appeals,
First Circuit.

Heard Sept. 15, 2004.

Decided Oct. 12, 2004.

James D. Herbert, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and Jeffrey Auerhahn, Assistant United States Attorney, were on brief, for appellant.

Judith H. Mizner, Assistant Federal Public Defender, with whom Leo T. Sorokin, Assistant Federal Public Defender, was on brief, for appellees.

Before SELYA, Circuit Judge,
COFFIN, Senior Circuit Judge, and
LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

This interlocutory appeal arrives on our doorstep following the district court's denial of a brink-of-trial continuance which, according to the prosecution, was necessitated by an Executive Branch faux pas de deux. The threshold question is one of first impression: Does the Criminal Appeals Act, 18 U.S.C. § 3731, afford jurisdiction to review the specific orders issued by the district court? Concluding that the orders appealed from are not within the purview of that statute, we answer this question in the negative and dismiss the government's appeal.

In order to place the jurisdictional conundrum in context, we recount the background facts as alleged by the government. The underlying case dates back to 1997. It began with a visit by a shady character, Zachary Dulac, to the Boston-area home of defendant-appellee Phillip E. Watson. This was far from a social call: Dulac subdued Watson and his live-in girlfriend, tied them up, and stole fifty-five pounds of marijuana.

The next day, Watson called an acquaintance, Richard Maynard, and asked for assistance in evening the score. Maynard enlisted defendant-appellee Shane E. O'Hearn and one George Lubell as comrades in arms. The three men tracked Dulac to a motel in Maine. On May 31, 1997, Dulac was assaulted in the motel's parking lot. The attackers then ransacked his motel room, absconded with $17,000 in cash, and warned him that they would be back for more.

Maynard, O'Hearn, and Lubell matched the general descriptions of the three assailants. Maynard died, but the government indicted O'Hearn and Lubell, along with Watson, for conspiracy, 18 U.S.C. §§ 371, 1951; for multiple violations of the Travel Act, *id.* § 1952; and for using a firearm during a crime of violence, *id.* § 924(c). Withal, despite the information available to it, the prosecution had a gaping hole in its case: no one could positively identify O'Hearn as a participant in the enterprise.

Enter Anthony Spera, a self-professed friend of both Watson and O'Hearn. According to the government, Watson had told Spera about his umbrage over Dulac's thievery and O'Hearn had told Spera that he was one of the men who assaulted Dulac. Since Spera could link both Watson and O'Hearn to the commission of the charged crimes, he loomed as a key witness in the government's case.

Spera, however, had problems of his own. We need not dwell on the details. It suffices to say that, in due course, he pleaded guilty to unrelated federal narcotics offenses. A district judge sentenced him to serve a thirty-month incarcerative term. And because Spera was an Italian national, his conviction for an aggravated felony exposed him to mandatory deportation. *See* 8 U.S.C. § 1227(a)(2)(A)(iii).

Spera finished serving his prison term in December of 2002. Immediately upon his release, the Immigration and Naturaliza-

tion Service (INS) detained him.[1] On January 14, 2003, the Assistant United States Attorney (AUSA) responsible for the instant case informed INS officials that the government viewed Spera as an important cog in the machinery of the upcoming criminal trial. The AUSA asked (i) that Spera not be deported until after he had testified, and (ii) that INS notify him (the AUSA) of any change in Spera's custody status. INS officials noted this two-part request, placed the AUSA's letter in Spera's immigration file, and entered an appropriate notation into their computer system.

Shortly thereafter, an immigration judge released Spera on bail pending final resolution of the removal proceedings. Spera's bail took effect on January 16, 2003. The INS apparently did not notify the AUSA of this change in Spera's status.

The criminal case proceeded slowly. Lubell managed to obtain a severance, see Fed.R.Crim.P. 14(a), and his trial began on February 23, 2004. Spera testified on February 25. One week later, the jury acquitted Lubell across the board. On the same day, the district court set a May 17 trial date for Lubell's codefendants (Watson and O'Hearn). The court later agreed to continue the case against O'Hearn, but Watson's trial date remained firm. There is no indication that the AUSA notified the INS that what originally had been anticipated to be one trial had morphed into two or more.

On May 10, the AUSA filed a motion to recuse the judge who had been presiding over the criminal case. See 28 U.S.C. § 455. The judge stepped aside. The reassignment of the case to a new trier caused a further postponement, with a joint trial scheduled to start on July 12.

During this same period, developments were occurring in connection with Spera's immigration case. According to the affidavit of James Dupont, an INS agent, the INS took Spera into custody on March 4, 2004, pending the culmination of the removal proceedings. The AUSA's letter was "located at the bottom of [Spera's] administrative file" and the notation instructing the INS to update the AUSA as to Spera's whereabouts was "inadvertently overlooked." The upshot was that the INS, without the AUSA's knowledge, deported Spera to Italy on June 1.

These bevues did not come to light until June 28, when the AUSA telephoned the INS in the course of preparation for the anticipated July 12 criminal trial. The news did not please the AUSA. Three days later, he moved to continue the trial, citing Spera's unavailability. The motion papers averred that the government needed time either to arrange for Spera's return or to take his deposition abroad. Before a hearing could be convened, the AUSA contacted Spera, who refused to return voluntarily unless the government allowed him to remain permanently in the United States. That demand left the prosecutors with only one viable option: deposing Spera abroad.

---

1. In March of 2003, Congress passed the Homeland Security Act of 2002, Pub.L. 107–296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)), which abolished the INS and transferred its duties to the newly created Department of Homeland Security. The INS functions related to immigration enforcement, including deportation, now reside in a separate sub-agency known as United States Immigration and Customs Enforcement (ICE). See, e.g., Lattab v. Ashcroft, 384 F.3d 8, 15 n. 2 (1st Cir.2004). Although we continue to use the acronym INS for the sake of continuity, our references to INS after the effective date of the Homeland Security Act should be understood as references to ICE.

The district court held a hearing on July 8. Following the hearing, the court ruled from the bench and denied the motion for a continuance. In the course of its ruling, the court expressed concern with the potentially lengthy delay that arranging a foreign deposition would entail; voiced doubts that the proposed deposition testimony, if obtained, would be admissible at trial; noted that the Speedy Trial Act, 18 U.S.C. §§ 3161–3174, was in play; and chastised the government, as an institution, for the comedy of errors that had led to Spera's premature deportation.

On the next day, the government filed a renewed motion. In that motion, the government (i) revived its request to continue the trial, and (ii) sought permission to depose Spera abroad pursuant to Fed. R.Crim.P. 15. The district court denied the motion forthwith. *See United States v. O'Hearn,* No. 01–10122, slip op., 2004 WL 1553599 (D.Mass. July 9, 2004) (unpublished). In its brief rescript, the court gave four reasons for reaffirming its earlier denial of a continuance:

1. This case is more than three years old. The indictment was returned on April 12, 2001.

2. There is a strong possibility that the Speedy Trial time has run since at least 78 days of unexcluded time appear on the record.

3. The problem, namely, the absence of the witness, was created by the inexcusable negligence of an agency of the government, albeit not the U.S. Attorney's Office. This calls into question the "unavailability" of the witness.

4. It will likely take at least 6 to 12 months to obtain the testimony of the witness. . . .

*Id.* at 2–3, 2004 WL 1553599. Accordingly, the court held the trial date inviolate and, in a contemporaneous electronic order, denied the motion to depose Spera abroad as moot.

The government appealed from both the July 8 and 9 orders, alleging that the district court had abused its discretion in denying the requested continuance. We stayed further proceedings in the district court, expedited the appeal, and directed the parties to brief both the merits and the threshold issue of appellate jurisdiction. We heard oral argument on September 15, 2004. For the reasons elucidated below, we now dismiss the appeal for jurisdictional reasons.

■ It is common ground that "appeals by the Government in criminal cases are something unusual, exceptional, not favored." *Carroll v. United States,* 354 U.S. 394, 400, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957). The government's ability to appeal in a criminal case is a matter of legislative grace and, thus, requires express statutory authorization. *United States v. Sanges,* 144 U.S. 310, 312, 12 S.Ct. 609, 36 L.Ed. 445 (1892); *United States v. Horn,* 29 F.3d 754, 768 (1st Cir.1994). Here, the government purports to find that authorization in the Criminal Appeals Act, 18 U.S.C. § 3731. That statute provides in pertinent part:

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

*Id.* (second paragraph). The statute further provides that its provisions "shall be liberally construed to effectuate" the purposes of the Act. *Id.* (final paragraph).

In considering this language, we think it useful first to dispense with a shopworn argument. The government cites the Supreme Court's decision in *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), for the proposition that section 3731 is "intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *Id.* at 337, 95 S.Ct. 1013. That citation is disingenuous. The *Wilson* Court was referring to the first paragraph of section 3731, which involves appeals from orders dismissing indictments. *See id.* at 337–39, 95 S.Ct. 1013. The Court's language reflected Congress's intent that all such orders would be appealable unless the Double Jeopardy Clause forbade that course of action. *See United States v. Kane*, 646 F.2d 4, 6–7 (1st Cir.1981).

The appeal in this case involves the second paragraph of section 3731, not the first. The *Wilson* Court's statement does nothing to broaden the scope of that paragraph. To construe the statement otherwise would open Pandora's jar,[2] giving the government free rein to appeal from interlocutory orders of virtually every kind and description. That would be an unprecedented departure, and there is not the slightest reason to believe that Congress intended to tilt the playing field in criminal cases so sharply in favor of the prosecution. *See id.*

Having consigned this argument to the scrap heap, we turn to the second paragraph of section 3731 (quoted above in full). To understand its limits, we must start at the point of its conception. This paragraph, which authorizes government appeals from suppression and exclusion orders under certain circumstances, derives from successive amendments to the Criminal Appeals Act. *See generally* 15B Charles Alan Wright et al., Federal Practice and Procedure § 3919.3 (2d ed.1992). Congress passed the first of these amendments in 1968. The raison d'être for this amendment can be traced to an imbalance created by the peculiarities of criminal procedure. On the one hand, if evidence were suppressed before trial, double jeopardy principles precluded the government from appealing the suppression order, even if erroneous, after an unfavorable verdict at trial. *See, e.g., Ball v. United States*, 163 U.S. 662, 671, 16 S.Ct. 1192, 41 L.Ed. 300 (1896) (holding that an acquittal is "final, and [can] not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the constitution"). On the other hand, if a defendant in a criminal case unsuccessfully sought to suppress evidence before trial, he faced no similar barrier to appeal should a conviction ensue. *See Wilson*, 420 U.S. at 343, 95 S.Ct. 1013 (acknowledging that a defendant can appeal a pretrial order after conviction, "even though the Government enjoy[s] no similar right").

Congress became concerned about both this disparity and the lack of uniform standards of admissibility that resulted from it. *See* S.Rep. No. 85–1478 at 14 (1958) (observing that "with 330 district judges, each having [his or her] own views as to what constitutes an illegal search, there never will be achieved any degree of uniformity

---

**2.** Although the more common allusion is to "Pandora's box," that usage is apparently erroneous. Zeus, determined to avenge himself on Prometheus, presented this femme fatale to Epimetheus (Prometheus' brother), first arming her with a jar containing all the evils of the world. After Epimetheus foolishly accepted the gift, Pandora proceeded to open the jar, thereby loosing a panoply of torments upon humanity. *See* R. Warner, Encyclopedia of World Mythology 29–31 (1975). As with so many things in life, however, there is another view. *See* Edith Hamilton, Mythology 86 (1942).

in the Federal law until the Government is granted the right to appeal"); H.R.Rep. No. 90–603, at 2–3 (1967) (noting that "in many instances the granting of [a motion to suppress] is, in effect, a final order bringing the prosecution to an end ... if the Government does proceed, it must do so under severe handicaps and limitations"). Despite these sentiments, Congress did not manage to pass corrective legislation until 1968, when an amendment was engrafted onto the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 1301, 82 Stat. 197, 237–38 (1968), granting the government a right of appeal from orders suppressing evidence. See 114 Cong. Rec. 14,784–87 (1968) (statement of Sen. Allott).[3] The floor amendment would become that part of section 3731's second paragraph dealing with appeals from suppression orders. See United States v. Robinson, 593 F.2d 573, 575–76 (4th Cir.1979); United States v. Greely, 413 F.2d 1103, 1104 n. 2 (D.C.Cir.1969) (per curiam). The subsequent use of this provision reflects its provenance. See, e.g., United States v. Maguire, 359 F.3d 71, 73 (1st Cir.2004); United States v. Paradis, 351 F.3d 21, 24 (1st Cir.2003); United States v. Hughes, 279 F.3d 86, 87 (1st Cir.2002); United States v. Downing, 665 F.2d 404, 405 (1st Cir.1981).

Courts rapidly began to shorten the reach of the amended version of section 3731 by construing the concept of suppression rather grudgingly. See, e.g., Greely, 413 F.2d at 1104–05. In a restorative effort, Congress further amended the second paragraph of section 3731 to encompass explicitly the exclusion of evidence as well as the constitutionally based suppression of evidence. See Omnibus Crime Control Act of 1970, Pub.L. No. 91–642, § 14, 84 Stat. 1880, 1890 (1971). At the same time, Congress added an express command to construe the statute liberally. Id., see S.Rep. No. 91–1296, at 37 (1970) (stating that "[t]he provision requiring liberal construction of 3731 reverses the practice of narrowly interpreting the Government's right to appeal in criminal cases").

The second paragraph of section 3731, in its present form, covers all pretrial orders that deny admissibility to virtually any evidence on virtually any ground. United States v. Barletta, 644 F.2d 50, 57 (1st Cir.1981). Subject to the other conditions limned in the statute (e.g., the timing of the ruling and the United States Attorney's willingness to make the requisite certification), the effect of the statute is to allow the government to appeal pretrial evidentiary rulings that otherwise would, even if erroneous, go unchallenged due to the acquittal of a defendant. See, e.g., United States v. Cunningham, 113 F.3d 289, 295 (1st Cir.1997); United States v. White, 743 F.2d 488, 493 (7th Cir.1984); see also United States v. Helstoski, 576 F.2d 511, 521 (3d Cir.1978) (holding that the second paragraph of section 3731, as amended in 1970, "was designed ... to insure that prosecutions are not unduly restricted by erroneous pre-trial decisions to exclude evidence" (emphasis supplied)), aff'd, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979). We have applied the statute accordingly. See, e.g., United States v. Amaya–Manzanares, 377 F.3d 39, 41–42 (1st Cir.2004); United States v. Gilbert, 229 F.3d 15, 17, 19–20 (1st Cir.

---

**3.** The amendment was not part of either the original House or Senate bill. Consequently, the statement of its sponsor, Senator Allott, comprises the bulk of the legislative history of the 1968 amendment. Senator Allott's statement expressly incorporated the reasoning of the prior congressional reports. See United States v. Greely, 413 F.2d 1103, 1104 n. 2 (D.C.Cir.1969) (per curiam).

2000); *United States v. Rakes*, 136 F.3d 1, 2–3 (1st Cir.1998); *United States v. Loaisiga*, 104 F.3d 484, 484–86 (1st Cir.1997); *United States v. Jobin*, 535 F.2d 154, 155 (1st Cir.1976).

In that process, we have read Congress's admonition to construe section 3731 liberally as a cue to put substance ahead of form in deciding whether pretrial orders suppress or exclude evidence. Four examples suffice to illustrate this point. In *Kane*, 646 F.2d at 7–8, we assumed jurisdiction over an appeal from a discovery order threatening to exclude evidence as a sanction for non-compliance, but only after the government had converted the conditional exclusion into an actual exclusion by "commit[ting] itself to a course of action which ma[de] exclusion, practically speaking, inevitable." In *United States v. Brooks*, 145 F.3d 446, 453 (1st Cir.1998), we made pellucid that the label used by a district court for a particular order did not control the issue of appealability. *See id.* at 453–54 (explaining that, depending on the circumstances, an order granting a motion in limine may be either an unappealable trial management device or an exclusionary order that prevents the use of evidence with sufficient finality to be immediately appealable). So too in *United States v. Flemmi*, 225 F.3d 78, 83–84 (1st Cir.2000), where the district court had left no doubt that it intended to suppress specific evidence, we entertained an immediate appeal despite the court's announced unwillingness to distill its ruling into an "appealable order" until after it had ruled upon dispositive motions. And, finally, in *United States v. DeCologero*, 364 F.3d 12, 21–22 (1st Cir.2004), we allowed an immediate appeal from an order bifurcating a criminal trial, which, in integral part, forbade the government from using certain evidence in the initial trial.

■ Although these exemplars show a willingness to construe the second paragraph of section 3731 liberally (as Congress has directed), they do not signify that we have cleared the way for prosecutors to appeal any and all pretrial orders. Section 3731 was "carefully circumscribed by Congress out of a desire (among other reasons) to safeguard individuals from the special hazards inherent in prolonged litigation with the sovereign." *United States v. McVeigh*, 106 F.3d 325, 330 (10th Cir. 1997) (citation and internal quotation marks omitted). Liberal though its construction may be, section 3731 unarguably restricts government appeals to specific categories of district court orders. *Id.* If an order falls outside those categories, the government's attempted appeal must be dismissed. *See, e.g., id.* (holding sequestration order not appealable under section 3731). That the order may thus become effectively unreviewable does not change the decisional calculus. *See, e.g., United States v. Booth*, 669 F.2d 1231, 1240 (9th Cir.1981); *United States v. Margiotta*, 662 F.2d 131, 137–41 (2d Cir.1981).

■ The case at hand does not fit within the scripted contours of the second paragraph of section 3731. The government's first motion explicitly requested a continuance in order to "explore various methods of obtaining [Spera's] testimony." That motion was heard and denied on July 8. Although the transcript shows that the district court had some concern about whether the deposition testimony, if obtained, would be admissible, the court's predominant focus was on the excessive length of time that already had elapsed following the return of the indictment. The court made no bones about its apprehension that the continuance requested by the government, if granted, would delay an already tardy trial by a minimum of another six to twelve months. The court's

references to admissibility were in the context of querying whether such an incremental delay, troublesome in and of itself, would be rendered even more problematic by the potential futility of the government's efforts.

The renewed motion, filed and decided the next day, sought reconsideration of the request for a continuance. The court's quadripartite rationale for denying this motion involved the length and effect of the delay and the government's institutional responsibility for the loss of its witness. *See supra* at 307. The admissibility vel non of Spera's deposition testimony was not mentioned in the court's rescript. The second order, like the first, reflected a case-management decision, pure and simple. Such orders ordinarily do not support section 3731 jurisdiction. *See, e.g., United States v. Stipe,* 653 F.2d 446, 447–50 (10th Cir.1981) (holding that order requiring government to prove conspiracy by independent evidence before admitting statements of coconspirators as non-hearsay was not appealable, where court expressed no view on admissibility of statements and "main thrust of the trial court's ruling was to adopt an order of proof").

■ Of course, some case-management orders can have the direct effect of excluding evidence and, thus, can be immediately appealed by the government in a criminal case. *See, e.g., DeCologero,* 364 F.3d at 21–22; *Brooks,* 145 F.3d at 453. Here, the record does not support an inference that the district court was engaged in the making of an evidentiary ruling (i.e., a ruling excluding deposition testimony). Quite the contrary: the record reflects the wise and judicious exercise of the court's responsibility to manage its docket and preserve the defendants' entitlement to their timely day in court. Consequently, neither order falls within the jurisdictional reach of section 3731. *See Barletta,* 644 F.2d at 53

(holding that where "no order suppressing or excluding evidence has been entered" and "nothing warrants 'construing' the district court's actions so as to dictate such an order," no appeal lies under section 3731).

In an effort to widen the angles of appealability, the government notes our admonition that "pretrial orders that have the practical effect of excluding material evidence at trial are appealable under section 3731." *Brooks,* 145 F.3d at 454; *accord DeCologero,* 364 F.3d at 22. The government attempts to stretch this language to cover the situation at hand. It asseverates that the district court's refusal to continue the trial has the practical effect of denying it the time needed to take Spera's deposition and, thus, will ineluctably lead to the exclusion of that evidence from the trial record.

We reject this argument. In light of the statutory language and the revealed congressional intent, the "practical effect" phrasing is a frank recognition that, in these purlieus, substance matters. That phrasing was never intended to serve as a wedge to force appellate jurisdiction whenever the government can point to an order as being a but-for cause of its inability to gather or present evidence at trial. Such a causal connection is a necessary but insufficient condition for appealability under the second paragraph of section 3731. Thus, an interlocutory appeal will lie only when the order itself is the practical equivalent of a suppression or exclusion order; that is, when the order has the direct effect of denying the government the right to use evidence. If such an effect is only incidental, then there can be no appeal. *See United States v. Hickey,* 185 F.3d 1064, 1066 (9th Cir.1999) (stating that section 3731 did not allow an appeal from a district court order denying a motion to unseal defendant's financial affidavits, when government sought to discover and

use information contained in affidavits as part of its case in chief); *United States v. Camisa,* 969 F.2d 1428, 1429 (2d Cir.1992) (ruling that a pretrial order denying motion to disqualify defendant's appointed counsel-who also was counsel for one of the prosecution's planned witnesses-was not appealable under section 3731 even though it meant that the witness's testimony might have to be excluded); *United States v. Lavallee,* 61 Fed.Appx. 631, 632 (10th Cir.2003) (holding that denial of continuance sought to allow an ailing witness to recover sufficiently to testify at trial was not appealable under section 3731).

Viewed through this prism, the government's argument for appealability in this instance cannot withstand scrutiny. Section 3731 was never intended as a means of giving the government time to scramble when it has allowed evidence to slip through its fingers. While substance must prevail over form, the gravamen of the orders at issue here is the denial of a continuance based on inordinate trial delay. Whatever incidental effect those orders may have on evidentiary matters, they are simply not the proximate cause of the exclusion of any evidence. Were we to hold otherwise and permit an interlocutory appeal from a routine order denying a continuance, we would be opening the very jar that we tightly closed in *Kane,* 646 F.2d at 6–7.

In exhorting us to find these orders appealable, the government relies heavily upon the decision in *United States v. Drogoul,* 1 F.3d 1546 (11th Cir.1993). There, the government sought authorization from the district court to take foreign depositions for use in a pending criminal case. *Id.* at 1550. The trial court denied the motion based, inter alia, on concerns over the defendant's ability to conduct meaningful cross-examination. *Id.* at 1551. The Eleventh Circuit accepted jurisdiction over the government's ensuing appeal, stating, in a footnote, that the order had the practical effect of excluding the witnesses' testimony. *Id.* at 1551 n. 13.

In *Drogoul,* however, the district court's order went to the merits; it denied leave to take depositions because it was not comfortable that the procedures available under the applicable treaty were legally sufficient to satisfy the Sixth Amendment. *See id.* at 1551. So construed, that order directly excluded evidence based on its legal merit (or, more precisely put, its lack of legal merit).

The circumstances of this case are materially different. As we have explained, the government's initial motion did not zero in on a desire to take a deposition, and it was denied on delay-related grounds. So was the government's second (renewed) motion for a continuance. These were routine case-management decisions, not directed at the exclusion of evidence. *Cf. United States v. Saccoccia,* 58 F.3d 754, 770 (1st Cir.1995) (describing such decisions as "peculiarly within the ken of the district court"). Because the court below did not purpose to rule on the merits of the deposition request, *Drogoul* is inapposite.

As said, the denial of the continuance left insufficient time to depose Spera abroad, and so the district court sensibly denied as moot the government's ancillary request for leave to take such a deposition. In its reply brief, the government recasts its argument to focus on this point. It seems to suggest that the district court artfully avoided ruling on its request to depose Spera by couching its decision in terms of the denial of a continuance. Government's Reply Br. at 4. This is empty rhetoric: it was the government that framed the central issue around its perceived need to postpone the trial. Thus, the suggestion that the court, by some thaumaturgical feat of legal legerdemain,

used the denial of a continuance as a masking device to insulate its exclusion of Spera's testimony from appellate review, is totally unfounded.

We need go no further. Although the orders appealed from will certainly hamper (and may effectively prevent) the obtaining and subsequent use of Spera's testimony, those orders did not, either in substance or in form, limit the pool of potential evidence that would be admissible at the forthcoming trial. Rather, they were premised on, and accomplished, a more prosaic goal: the lower court's determination to forestall further delay. That was why the court denied the requested continuance-and the practical effect of that denial was to clear the way for the trial to proceed. That the orders had an incidental effect on the government's evidence-gathering is too remote a consequence to support appellate jurisdiction under the second paragraph of section 3731.

*The appeal is dismissed for want of appellate jurisdiction.*